******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# TOWN OF NEW MILFORD *v.* STANDARD DEMOLITION SERVICES, INC.
## (AC 43874)

Bright, C. J., and Elgo and Bear, Js.

*Syllabus*

The plaintiff town sought to recover damages from the defendant contractor for breach of contract. The plaintiff owned a vacant brass mill factory that was contaminated with, inter alia, polychlorinated biphenyls (PCBs). The plaintiff, on the advice of consultants, applied to the United States Environmental Protection Agency (EPA) for permission to demolish and clean up the property and engage contractors to perform the work. The plaintiff issued a notice inviting prospective contractors to provide bids for the third phase of the project, which involved the demolition, abatement and remediation of the property. The notice indicated that the contractor would be allowed to keep the scrap value of any structural steel salvaged from the site. The plaintiff made all public information about the project available to prospective bidders, including a report from one of its consultants that referenced the presence of PCBs throughout the building. The plaintiff also provided a letter to all prospective bidders clarifying that the selected contractor would be responsible for the sampling and disposal of any PCB contaminated material. The defendant submitted the winning bid for the contract, in which it did not allocate any funds for the remediation or disposal of any contaminated structural steel on the site, as it believed that the steel was not contaminated and could be recycled without remediation. Once selected, the defendant executed a certification acknowledging that it had read and agreed to abide by all conditions set forth in the EPA's approval letter for the third phase of the project, which included attachments regarding the cleanup of PCB contaminated material and correspondence between the EPA and the plaintiff regarding the PCB contamination of various materials, including steel beams. The parties then entered into a contract for the phase three work, which expressly incorporated the EPA approval letter and established a 140 day deadline for the defendant to complete the job. Two months after the plaintiff had issued the defendant a notice to proceed, the defendant still had not obtained EPA approval of its contractor work plan, which was required before it could begin any substantial demolition work, and it had become engaged in a dispute with the plaintiff regarding the testing and disposal of the structural steel on the property. The defendant contended that the plaintiff mischaracterized the steel, leading it to believe that the steel was not contaminated and could be disposed of without remediation. The defendant claimed that it remained ready, able and willing to perform the work on the project, but it refused to do so if it was required to sample the steel to determine whether it was contaminated and told the plaintiff that it had accidentally executed the contract, as it had submitted its bid without information regarding the contamination of the steel or knowledge that the disposal of any contaminated steel would be its responsibility. Thereafter, the plaintiff sent a letter to the defendant, notifying the defendant that it was in default because, inter alia, it would not be able to timely complete its work under the contract and had anticipatorily breached various provisions of the contract, and, consequently, its employment was terminated. The plaintiff rebid the project and hired C Co. to complete the work on the site, including the testing and disposal of the structural steel. C Co. was unable to finish its work, however, due in part to the increased expense and time required to finish the project as a result of the defendant's intervention, which led to additional testing requirements imposed by both the EPA and the trial court. The trial court found that the plaintiff had established its claim for breach of contract and had suffered damages, limited to the liquidated damages provision of the contract, in an amount equal to 254 days, less the retainage held by the plaintiff. The defendant appealed, and the plaintiff cross-appealed, claiming that the trial court erred in its award of damages. *Held*:

1. The defendant's claim that the trial court misapplied state and federal environmental laws was belied by the trial court's findings, which were supported by the record: the defendant did not raise before the trial court, nor did the trial court address, the defendant's claims that the plaintiff lacked proper authorization from the EPA to work on the undisclosed waste at the site or that the plaintiff and the trial court disregarded certain statutory (§ 22a-467) requirements relating to the disposal of PCB contaminated material, and, accordingly, this court declined to address those claims; moreover, the defendant's claims that the plaintiff failed to adequately characterize the site and that the plaintiff was required under the contract to paint chip test the steel beams prior to the defendant performing any work at the site lacked merit, as the trial court found that the contract did not require paint chip testing, that the testimony of the plaintiff's expert witnesses that paint chip sampling under such circumstances was not customary was credible, that there was no express statement in the contract that the steel was not contaminated, that the plaintiff performed its obligations under the contract, and that the contract overwhelmingly placed the obligation for the testing, handling and processing of the material on the site on the defendant and expressly made clear that the risk of the condition of the materials being different than anticipated was solely on the defendant, and such findings were supported by the clear and unambiguous provisions of the contract and the documents related thereto; furthermore, this action involved a breach of contract claim, and the defendant failed to provide a clear explanation as to how its claims concerning the EPA regulations circumvented the trial court's findings regarding the contract and failed to raise at trial its claims that the plaintiff's conduct constituted a violation of the EPA regulations and that the trial court erred in failing to find such a violation; additionally, although the defendant may have made its bid and entered the contract on the basis of a mistaken basic assumption, neither the trial court nor this court was permitted to rewrite the contract or to relieve the defendant of its obligations thereunder, as the defendant was a sophisticated and experienced party with respect to the type of work covered by the contract, it had the opportunity to address any issues it had with the proposed terms and interpretation of the contract prior to its execution, and the circumstances of the contract formation were not unconscionable.

2. This court declined to review the defendant's claim that the trial court erred in finding that the contract was not impossible to perform: because the defendant failed to plead impossibility as a special defense, such issue was not properly before the trial court, which, accordingly, did not undertake the necessary analysis of such claim nor did it make any findings thereon, and, as a result, the trial court could not have erred in failing to find that the defendant's performance under the contract was impossible; moreover, it was incumbent on the defendant to seek an articulation of the trial court's decision as to its failure to make a finding on a claim that the defendant alleged was properly before the trial court, and, in the absence of such an articulation, the record was inadequate for this court to review the claim.

3. The defendant's challenge to the trial court's implicit determination that the plaintiff lawfully had terminated the contract was unavailing: the defendant's claim was premised on a faulty assumption, namely, that the plaintiff was in default under the contract, because the trial court expressly found that the plaintiff had performed its obligations under the contract and that there was ample evidence of the defendant's breach of its obligations under the contract, which findings were supported by the record.

4. The defendant's claim that the change orders granted to C Co. in connection with additional paint chip testing requirements imposed by the EPA—which were not a part of the defendant's contract with the plaintiff—constituted an admission by the plaintiff that its contract with the defendant could not have been performed without such testing was contrary to the record and unavailing: the defendant's argument failed to acknowledge the basis for the change orders sought by C Co., namely, that the trial court found that the plaintiff was not required to conduct paint chip sampling under the contract with the defendant because the EPA did not require such testing until after the plaintiff had terminated that contract, as the requirement was instituted as a result of the defendant's unilaterally contacting the EPA with respect to the paint chip sampling it had conducted on the site as part of this litigation; moreover,

such finding was supported by the record and was not clearly erroneous.

5. Although the amount of the trial court's award of liquidated damages was proper, that court erroneously failed to determine whether the plaintiff proved that it had suffered any compensable actual or consequential nondelay damages:

a. The trial court improperly determined that liquidated damages were the plaintiff's exclusive remedy under the contract: the language in the liquidated damages provision clearly applied to damages resulting from delay, there was no language in the contract expressly stating that such damages were the plaintiff's exclusive remedy for a breach unrelated to the defendant's delay in performance, and to interpret liquidated damages as the plaintiff's sole remedy would render the contract's damages and losses provision superfluous; accordingly, the trial court erroneously failed to determine whether the plaintiff proved that it had suffered any compensable actual or consequential nondelay damages and, if so, the amount of such damages, and, as a result, the case was remanded to the trial court for a new hearing in damages.

b. The trial court did not err in limiting the award of liquidated damages to 254 days: the plaintiff's claim on appeal that liquidated damages instead should have run through the date of the trial court's decision failed, as the plaintiff did not make such a request at trial and the premise of such claim no longer existed because it was based on the trial court's determination that liquidated damages were the plaintiff's exclusive remedy under the contract, which this court concluded was made in error.

Argued November 30, 2021—officially released April 26, 2022

*Procedural History*

Action to recover damages for breach of contract, and for other relief, brought to the Superior Court in the judicial district of Litchfield, where the defendant filed a counterclaim; thereafter, the matter was tried to the court, *Shaban, J.*; judgment for the plaintiff on the complaint and on the counterclaim, from which the defendant appealed and the plaintiff cross appealed to this court. *Reversed in part*; *further proceedings*.

*Raymond A. Garcia*, with whom were *Nyle K. Davey*, and, on the brief, *Lauren Lyngholm Crowe* and *Jonathan A. Krumeich*, for the appellant-cross appellee (defendant).

*John D. Tower*, with whom was *Graham W. Moller*, for the appellee-cross appellant (plaintiff)

BEAR, J. The defendant, Standard Demolition Services, Inc., appeals from the judgment of the trial court rendered in favor of the plaintiff, the town of New Milford, on the plaintiff's complaint for breach of a contract entered into by the parties and as to all counts of a counterclaim filed by the defendant. On appeal, the defendant claims that (1) the court misapplied state and federal environmental regulations, (2) the court erred in not finding that the contract was impossible to perform, (3) the court improperly determined that the plaintiff lawfully had terminated the contract,[1] and (4) evidence of certain change orders executed by the plaintiff in connection with a subsequent contract with a different contractor, pursuant to which the plaintiff had agreed to modify terms of that contract, constituted admissions that the plaintiff's contract with the defendant was defective and could not be performed by the defendant as written. The plaintiff has cross appealed, claiming that the court erred in its award of damages to the plaintiff. We affirm the judgment of the court in favor of the plaintiff on its complaint for breach of contract and as to all counts of the defendant's counterclaim, but we reverse it in part with respect to the award of damages and remand the case for a new hearing in damages.

At the trial of this matter, which spanned over twenty-two days, the parties testified, presented lay and expert witnesses, and submitted 273 documents into evidence. In a comprehensive memorandum of decision, the court, *Shaban, J.*, found the following facts: "The plaintiff is the owner of an industrial property located at 12 Scovill Street in New Milford, which it acquired through a tax foreclosure in 1999. The property consists of fifty-three acres [and] includes an approximately 315,000 square foot vacant brass mill factory contaminated with polychlorinated biphenyls (PCBs) and asbestos containing materials . . . . The plaintiff renamed the site the 'Century Enterprise Center' and hired consultants to help evaluate the environmental hazards on the site. Under the guidance of the consultants, the plaintiff made decisions about how it would apply to the United States Environmental Protection Agency (EPA) for permission to demolish and clean up the property and engage contractors to perform the work.

"Prior to its involvement with the defendant, the plaintiff had already completed two phases of the work in its effort to clean up the property. In phases I and II of the project, the plaintiff's consultants, Tighe & Bond, had characterized the structural steel on the site as 'non-porous.'[2] The EPA approved the work proposed by the plaintiff through its consultants for phases I and II and it was completed. For phase III of the project, the demolition, abatement, and remediation work, the plaintiff hired TRC Environmental Corporation (TRC)

as its consultant and project manager. In performing its evaluation of the site, TRC reviewed and relied on the findings of the prior consultants from the phase I and II portions of the project. During the earlier phases, there had been extensive communication between the prior consultants and the EPA about the project. TRC found that the work had been allowed to proceed as proposed and that wipe sampling of 'porous' surfaces had been done.[3] In 2015, after TRC set the scope of work for phase III, the plaintiff applied for and secured a $2.5 million grant from the Department of Economic and Community Development . . . for the project.

"Thereafter, the plaintiff issued a Notice to Bidders [notice] inviting prospective contractors to provide bids for the demolition, abatement, and remediation of the property based on the proposed plan developed by TRC. . . . Bid packages were made available to all of the prospective bidders as part of the notice, which included the proposed contract documents.[4] The documents were also available through an on-line website. The notice recited that additional documents were available for review in a public reading room at the New Milford Public Works facility. Electronic thumb drives were also made available that included all historical records, plans, drawings, studies, and other relevant information from phases I and II. . . . The bid forms provided to the prospective contractors included a line item for the scrap value of the structural steel [that] the contractor would be allowed to keep. All of the public information in the plaintiff's possession regarding all three phases of the project, including correspondence with the EPA, was made available to prospective bidders for inspection and review. This included a facility investigation document prepared by Tighe & Bond that referenced the presence of PCBs throughout the building's interior that had likely been spread through dust. . . . This also included an engineering evaluation/cost analysis relative to the interior of the building. . . . On May 26, 2015, a mandatory prebid meeting was held by the plaintiff with the prospective bidders. . . . Following that meeting, on June 2, 2015, the plaintiff held an open house and walk-through at the site for all prospective bidders. . . . The defendant attended the open house and physically viewed the site. Both prior to and following the meeting and open house, and prior to the submission of its bid, the defendant submitted to the plaintiff multiple requests for information about the project to which the plaintiff responded. . . .

"In addition, the plaintiff invited all potential bidders to submit in writing any questions they may have had about the project. By letter of June 12, 2015, the plaintiff provided all potential bidders with the responses to a list of those questions that had been submitted as of June 10, 2015, in a document described as 'Clarification No. 1.' . . . Several questions dealt with the sampling and disposal of PCB contaminated materials. The funda-

mental response to each of these questions was that the contractor selected for the project would be responsible for the sampling and disposal of all such materials. The plaintiff conveyed that its only obligation was to do verification sampling of items left on-site after the job was completed. . . .

"On June 15, 2015, following completion of its inquiries and review of the bid specifications, the defendant submitted its bid in the amount of $2,713,950 on the forms supplied by the plaintiff, which included Clarifications Nos. 1 and 2 as addenda. . . . The defendant's bid did not provide for the remediation, abatement, and disposal of the contaminated structural steel on the site based on its belief that the information made available by the plaintiff represented or implied that the structural steel was not contaminated and could be recycled without remediation. . . .

"By letter of July 16, 2015, the plaintiff notified the defendant that it was the successful bidder. . . . On September 1, 2015, the EPA issued a five page approval letter authorizing the plaintiff to move forward with phase III of the project subject to the conditions set forth in the letter. . . . At the time of its bid, the defendant was aware that the EPA could impose additional conditions on the work to be done beyond those set forth in the proposed contract. Paragraph 13 of the approval letter provides: 'The PCB cleanup standard for *porous surfaces* (i.e., concrete) and soil shall be less than or equal to . . . 1 part per million ("ppm") for unrestricted use or disposal. The PCB cleanup standard for *non-porous surfaces* (e.g., overhead cranes, steel beams) shall be less than . . . 10 µ/100 cm for unrestricted disposal and/or recycling. (a) PCB contaminated wastes shall be removed and disposed of as detailed in the [attached Administrative Record], except as follows . . . (ii) Steel beams shall be disposed of as a [greater than or equal to] 50 ppm PCB waste or alternatively shall be sampled to determine PCB disposal requirements [and] (iii) If samples are collected, sampling analytical results and proposed waste disposal details shall be submitted to [the] EPA for review prior to removal of these wastes from the [s]ite.' . . . The EPA's definition of the steel beams as non-porous was consistent with the definition that had been given by Tighe & Bond in phase II of the project. . . .

"The EPA's letter was accompanied by two attachments, the first of which set forth the 'PCB Cleanup and Disposal Approval Conditions,' and the second of which was identified as the 'Administrative Record (Notification).' . . . Paragraph 11 (a) [of attachment one] required the plaintiff to provide to the EPA 'a certification signed by its selected abatement/demolition contractor [the defendant], stating that the contractor(s) has read and understands the Notification, and agrees to abide by the conditions specified in this

[a]pproval . . . .'

"Attachment [two] consists of a series of documents and correspondence reviewed by the EPA prior to the issuance of its approval . . . [some of which included] discussions of PCB contamination of various materials including overhead cranes and steel beams. Also, § 5.8 of the phase I PCB Source Removal Notification dated December, 2004, prepared by Tighe & Bond references PCB wipe sample test results for nonporous materials such as building interior walls and beams. . . .

"In its September 1, 2015 approval letter, the EPA noted that '[a]ttachment [two] provides a list of supporting information for the [p]hase III project . . . which [the] EPA considered for this [a]pproval. All submittals in their entirety are considered "the Notification."' . . . The next day, September 2, 2015, the plaintiff forwarded by e-mail a copy of the approval letter to the defendant. . . . That e-mail had appended to it all of the materials making up the attachments to the approval letter. In the e-mail, Michael Zarba . . . the public works director for the plaintiff, asked that the defendant review the materials and let him know as soon as possible if there were any questions. . . . In response, the defendant sent by e-mail a letter dated September 3, 2015, which was the certification relative to the 'Notification' that was required by the approval letter. . . . The letter expressly states that '[the defendant] has read and understands the "*Self-Implementing On-site Cleanup & Disposal Plan*," dated January, 2015, prepared for the [plaintiff] for the Century Enterprise Center project. [The defendant] agrees to abide by all aspects of the conditions specified in the EPA approval.' . . . This included compliance with EPA regulations under 40 C.F.R. § 761 relative to the removal and abatement of PCBs. The defendant did not raise any questions as to the materials submitted or the conditions of the approval letter. Thereafter, on September 4, 2015, the parties executed a highly extensive and detailed contract for the work on the project that expressly incorporated the approval letter. . . .

"Following receipt of the certification letter and the execution of the contract, the plaintiff issued to the defendant a letter dated September 14, 2015, which constituted a 'Notice to Proceed' as required by the terms of the contract. . . . That notice directed the defendant to commence work on the project and reminded the defendant that pursuant to the terms of the contract it had 140 calendar days to complete the job, thereby creating a deadline of February 1, 2016. Thereafter, the defendant commenced work on the project, including the preparation and submission of certain documents to TRC for its review and approval as the plaintiff's project manager. More specifically, the defendant was required to submit a contractor work plan (CWP) for the PCB remediation to be done by the defen-

dant on the job site. The CWP, subject to the approval of TRC, was in turn to be submitted to the EPA for its review and approval. The first CWP, dated September 24, 2015, was submitted to the plaintiff on September 29, 2015, and was based in part on TRC's own Modified Self-Implementing Phase III Remediation Plan dated January, 2015. . . . The first CWP . . . was reviewed by TRC and found [to be] insufficient in various ways. The comments of TRC were forwarded to the defendant on October 2, 2015, by e-mail and specifically referenced that the CWP should '[i]nclude a discussion of steel beam sampling and disposal means and methods per [paragraph] 13 (a) (ii) of [the] EPA's approval letter' and '[i]nclude a statement that sampling analytical results will be submitted to [the] EPA for review prior to disposal per [paragraph] 13 (a) (iii) of [the] EPA's approval letter.' . . . With respect to § 2.4 of the proposed plan regarding remediation of overhead cranes, TRC commented that '[t]he EPA's approval states that the beams must be handled and disposed of as a [greater than or equal to] 50 ppm PCB waste or will be sampled to determine disposal requirements.' Following the receipt of TRC's comments, the defendant hired an independent consultant with expertise in the handling of PCBs and submitted the plan and TRC's comments to him for his review. . . .

"The defendant was also required to submit to TRC for its review and approval, a health and safety plan . . . as well as a demolition work plan. TRC reviewed the [health and safety plan], found it lacking and provided comments thereon to the defendant. As of October 19, 2015, TRC had not received a response to those comments. . . . TRC insisted that the [health and safety plan] and other plans had to be approved before substantive physical work on the project could begin despite the defendant's belief that it was for review purposes only. . . .

"While attempting to work this out, the parties continued to work toward an acceptable CWP. Following the review of the original CWP by the defendant's consultant for approximately one month, a second CWP was submitted to TRC on November 6, 2015 . . . . In the second CWP, the defendant proposed that, as part of its operations, it would conduct wipe sampling of the steel columns for PCB characterizations to determine whether the structural steel could be disposed of consistent with [paragraph] 13 (a) (ii) of the EPA's approval letter. . . . The defendant also proposed paint chip sampling of the overhead crane steel to determine how it should be disposed of. On November 9, 2015, TRC rejected the proposed plan. . . . By e-mail on November 12, 2015, to the defendant, TRC provided specific comments deleting the proposed paint chip sampling language and put in language about wipe sampling consistent with the EPA's approval letter. Richard Gille of TRC credibly testified that the reason for deleting the

paint chip test language was that such testing was unnecessary as it would not show any PCB surface contamination on the steel (given that paint chip sampling is designed to determine if a product is manufactured with PCBs, i.e., that it is bulk waste product). That same e-mail also indicated that TRC was still awaiting a revised [health and safety plan] from the defendant. . . .

"Based on the comments of TRC, the defendant submitted a third proposed CWP on November 13, 2015 . . . which deleted the paint chip sampling language. . . . On November 18, 2015, following some additional edits requested by TRC, the defendant submitted its fourth proposed CWP . . . . TRC recommended to the plaintiff that it be submitted to the EPA for approval. . . . That recommendation was based on TRC's contractual authority to review and approve such plans. The plan called for the defendant to conduct wipe sampling of the steel columns. . . . It expressly recited that '[i]n accordance with the EPA [a]pproval [l]etter, the steel within the building is assumed to contain PCB concentrations [greater than] 50 ppm in surface contamination caused by previous transformer remediation and/or historic site activities. Wipe sampling will be conducted in order to prove that the structural elements can be recycled without restriction. . . . Steel found to contain PCB above the remedial goal will be decontaminated again in accordance with [40] C.F.R. [§] 761.79 and/or will be disposed of as PCB remediation waste.' . . . The plan was submitted to the EPA on November 18, 2015. The plan, however, was not approved because the EPA responded with comments and questions it wanted addressed. This included questions about the possible wipe sampling of cranes and steel beams and testing of the expansion joint caulking. . . . The EPA did not suggest or ask for paint chip sampling. In light of the comments and questions, on December 10, 2015, the parties agreed that they would hold off on resubmitting a CWP or doing further work until after TRC had done testing of the expansion joint caulking to determine if there was PCB contamination and, if so, how it should be treated for purposes of disposal. . . . The additional testing took six days and was done by the plaintiff.

"By letter dated December 15, 2015, the defendant issued a formal notice of delay to the plaintiff claiming the project had been delayed by ninety-four days due to the actions of the plaintiff. . . . Among other things, the formal notice cited the plaintiff's failure to 'initially characterize and remove potentially PCB contaminated paints and dust on the steel beams and expansion joint material in the concrete.' . . . The defendant also submitted with the letter a new work schedule indicating a completion date of on or about May 4, 2016. On December 16, 2015, TRC directed the defendant to 'continue with [the] EPA work plan preparation and submit

for review by TRC using your planned method for expansion joint removal. Disposal considerations will be addressed later.' . . . On December 22, 2015, the defendant responded that it would like any test results forwarded to it as it was likely that the EPA would require the information in the CWP. . . .

"Because it had taken approximately two months to obtain a CWP acceptable to TRC and the plaintiff for submission to the EPA for its consideration, the defendant elected to demobilize from the site on November 20, 2015, as it had not yet obtained an approved CWP to allow it to do any substantive demolition work. . . . The defendant had earlier indicated to TRC that it would not remobilize on the site until the CWP was approved. . . . Edward Doubleday of TRC credibly testified that he spoke with Stephen Goldblum, the president of the defendant, who stated that the defendant would not proceed with further work until the plaintiff took responsibility for anything related to the contaminated steel, including any wipe sampling. Also, during the period from mid-September to mid-December, the parties, through TRC, became engaged in a dispute over the characterization, testing and disposal of the structural steel on the site. The defendant contends that the plaintiff had mischaracterized the structural steel as nonporous and that it should have been characterized as porous given that many steel beams were painted. The defendant claims that the mischaracterization effectively led it to believe that the steel was not contaminated and could be disposed of without remediation. How the steel was characterized had cost implications as any steel with a PCB concentration of greater than 50 ppm could only be disposed of at a limited number of waste facilities, which, in turn, would result in higher disposal fees and transportation costs. There were also higher decontamination costs.

"Under the terms of the contract . . . any '[s]teel for salvage shall become the property of the Contractor. . . . The risk for quantity and value of scrap shall be the Contractor['s]' . . . . Line 8 of the bid form also stated that the '[q]uantity and value of scrap above and below the Lump Sum bid is at Contractor['s] . . . sole risk/reward.' . . . In bidding the project on the presumption the steel was not contaminated, the defendant had not allocated any costs associated with the disposal of contaminated steel. The defendant took the position that, under the contract, the steel was to be tested for PCBs and that it was the responsibility of the plaintiff to do so. The defendant further contended that the failure to properly characterize the steel resulted in its inability to recycle it in such a way that it would be able to obtain a financial credit of at least $200,000 as anticipated by the bid and contract for an estimated 1000 tons of steel at $200 per ton.

"This issue over who was to do the PCB sampling of

the structural steel and the subsequent disposal was discussed as early as September 22, 2015, during the weekly job meeting. At that meeting, TRC made reference to paragraph 13 (a) (ii) of the EPA approval letter and advised the defendant that it was [the defendant's] responsibility as the project contractor to do the sampling of the steel. This is also evidenced, in part, by the weekly meeting minutes, which note that the defendant claimed several of the EPA requirements specified in the EPA approval letter were the basis for a change in the contract. . . . In response, TRC indicated to the defendant on each occasion that if it was seeking a change in the contract it should formally submit a written request in accordance with its terms. . . . Eventually, on November 27, 2015, the defendant submitted a written notice to the plaintiff seeking a change to the contract based on a 'discovery of undocumented conditions,' which were described as follows: 'The structural steel of the building has not been characterized to the satisfaction of the EPA. This characterization sampling is not included as our work in the specification.' . . . This notice was followed by a November 30, 2015 letter from the defendant directly to the plaintiff detailing its issues with the steel sampling and disposal. . . . Generally, the defendant contended that the bid documents did not include the initial characterization of the structural steel, the final approved Modified Self-Implementing Plan, and the disposal of any hazardous (contaminated) steel as the defendant's obligation. The defendant took the position that, because this information had not been provided to it during the bidding process, 'the final contract was then accidently executed by [the defendant] after the [plaintiff's] incorporation of the EPA [a]pproval [l]etter—without price change—despite significant increased scope and potential adverse cost impact.' . . . Nonetheless, the defendant indicated [that] it remained ready, willing, and able to perform the work on the project. By this point in time, approximately 55 percent of the time allocated for the completion of the work had passed. While stating [that] it remained ready, willing and able to do the work, the defendant also made statements to TRC at weekly job meetings around the same time that it would not perform any work if it was required to sample the steel. . . .

"The plaintiff responded by letter dated December 9, 2015, effectively rejecting the defendant's claims and reminding it that time was of the essence relative to the completion date under the terms of the contract. . . . The defendant responded on December 15, 2015, noting that, because the plaintiff 'failed to initially characterize and remove potentially PCB contaminated paints and dusts on the steel beams and expansion joint material in the concrete,' it was unable to complete the CWP, which was needed in order to allow the start of demolition activities. . . . The defendant claimed that,

as a result of the plaintiff's failures, it was entitled to a compensable delay of ninety-four days in the completion of the contract. . . . Thereafter, the plaintiff issued a letter dated January 4, 2016, notifying the defendant that it was in default and was therefore terminated from its employment under the contract, effective January 11, 2016. . . . As of the date of the letter, the defendant had yet to provide to the plaintiff a revised CWP, an acceptable [health and safety plan], or a demolition work plan. The basis for the termination letter was that the defendant would not be able to timely complete the work, it failed or refused to comply with pertinent laws, ordinances or the instructions of the engineer (TRC), violated or anticipatorily breached various provisions of the contract, and failed to press the work to completion. Further, [the defendant having contended] in its November 30, 2015 letter that [it] had 'accidently executed' the contract, the plaintiff considered the defendant to have renounced and anticipatorily breached the contract. There was credible testimony from both parties that no substantive work was done on the project thereafter. Based on the defendant's own payment application for work done through November 30, 2015, only 9.51 percent of the work on the project had been done. . . . As of January 11, 2016, including the six day contract extension provided by the plaintiff to the defendant, 82 percent of the time allowed for the completion of the work had passed (119 of the 146 days). Shortly thereafter, on January 15, 2016, the plaintiff filed the present complaint against the defendant.

"While pursuing its complaint, the plaintiff undertook the effort to complete the project by putting out to bid what it saw as the remaining work to be done. . . . Following a procedure similar to that of the original bid, including the contractor's bid meeting, on-site visit, and the provision of documents for review and question clarifications, a total of nine contractors submitted bids on the project. [The March 31, 2016 bid of] Costello Dismantling [Company, Inc.] (Costello) . . . of $2,962,207 was accepted by the plaintiff. . . . The scope of work to be done was the same as that of the defendant except for the work that had already been completed by the defendant. Costello commenced work on the project shortly thereafter. Mike Costello, as project manager for Costello, credibly testified that, at the time of its original bid in 2015, Costello understood from its reviews of the bid documents and specifications that PCB contamination existed on the job site in the concrete and expansion joint caulking. Similar to the defendant, Costello also considered the structural steel to be recyclable. Costello, however, recognized that it bore the risk of the steel being contaminated and might have to bear the cost of any testing or disposal. Upon its rebid, in 2016, Costello understood that it might bear the cost of the testing and disposal given the terms of the EPA approval letter and the contract. Therefore, at

the time of both bids, Costello took into consideration that decontamination was required by the contract specifications consistent with what it considered to be the surficial standard for testing as set out in the approval letter. In other words, wipe sampling was going to be required as part of the job.

"Costello's work on the project was interrupted when the defendant directly contacted the EPA by e-mail dated September 1, 2016, to provide it with information about paint sampling that was to be done on the site pursuant to an August [19], 2016 order of this court in this action.[5] . . . This e-mail was sent approximately eight months after the defendant had been dismissed from the job. What followed was a series of e-mails and phone calls between the defendant and the EPA through November 21, 2016. This correspondence included reports and findings from the defendant's consultant and trial expert, John Insall of Partner Engineering, regarding the paint sampling and the results thereof, which showed that some of the samples contained PCBs in excess of 50 ppm. . . .

"During this time, Costello continued other work on the project, providing CWPs and revisions of the plans based on the review and comments of both TRC and the EPA. As part of the plans, Costello, which operated with the understanding that it had the contractual responsibility for the sampling of PCBs on the steel beams and other surfaces, submitted to TRC for its approval a PCB sampling plan dated August 17, 2016, prepared by its consultant, Strategic Environmental Services, Inc. . . . That plan noted that previous investigations had reported PCB concentrations in excess of EPA limits on painted metal surfaces of the main carrying beams for the overhead cranes. TRC approved the plan and, in turn, submitted it to the EPA for its approval. . . . A series of correspondence followed from September 9, 2016, to November 9, 2016, between the plaintiff and the EPA in which additional questions and comments, including those about painted surfaces, were made by the EPA. . . . Included was a comment by the EPA that should the paint chip samples sought by the defendant (in the court action) reveal PCBs in the paint, a change to the decontamination plan might be necessary. . . . After the submission of the multiple CWPs, the EPA approved Costello's CWP on October 5, 2016. . . . Costello then began the demolition of the structure at the site. Subsequently, following the receipt of the paint chip sample results from the defendant through Insall on November 21, 2016, the EPA did require additional testing of the steel beams and other materials. That testing was ultimately done by the plaintiff.

"While the litigation continued, Costello still attempted to do certain work on the property. During the course of its work on the project, Costello submitted eleven

change order requests. Most, but not all, were approved by TRC. . . . By September 21, 2017, nearly a year after the EPA first approved Costello's CWP, the EPA approved the plaintiff's plan for decontamination and recycling of the structural steel. . . . The approval was consistent with the original September 1, 2015 approval letter subject to certain additional conditions such as the additional testing of steel beams and other materials, which were the result, in part, of the court-ordered paint chip sample results that the defendant unilaterally provided to the EPA on November 21, 2016. It also required the plaintiff to provide to the EPA and the Connecticut Department of Energy and Environmental Protection [department] the paint chip and wipe sample results of any waste to be shipped off-site. This was, in effect, the requirement to do verification sampling, which the plaintiff was already obligated to do under the terms of the contract[s] with both the defendant and Costello. Such conditions were within the discretion of the EPA to add and required the plaintiff, where paint chip samples revealed the presence of PCBs [greater than or equal to] 50 ppm, to decontaminate or dispose of the steel in accordance with paragraph 13 (a) (ii) and (iii) of the original approval letter. In effect, the EPA required the plaintiff to do nothing more than what it was originally required to do relative to the disposal of the steel. The letter was not amended or modified relative to the characterization and treatment of the steel beams, nor were any other of its terms or provisions changed in that regard. As worded, the original approval letter did not specifically detail the frequency of sampling or preclude the decontamination of the steel to bring the PCBs down to a level where the steel could be recycled. . . .

"Having done wipe sampling of the structural steel as part of its work, Costello found some beams were beyond acceptable contamination standards. Following completion of the sampling, Costello then began decontamination of those beams through a pilot decontamination program, which proved very successful. The decontamination process, however, was stopped due to this pending litigation, which had prompted the EPA to seek the additional testing. . . . To that point there only remained a few contaminated items. Mike Costello credibly testified, as a disclosed expert, that had Costello been able to complete the decontamination process, there was a disposal facility that would have accepted the steel for recycling. Also, as part of the scope of its work, Costello was to take down the roof of the building, which it had done sometime in the fall of 2016. . . . Because of the defendant's correspondence to the EPA regarding the test results, the EPA also asked for the testing of the roofing material, which added additional cost and delay to the completion of the project. . . . In fact, because of the issue being raised by the defendant, Costello was never able to

finish the project, including the treatment and disposal of the steel for recycling. This was in part because, rather than disposing of the steel and debris, it then had to stockpile it on the site for examination and testing. . . . By that point, the plaintiff's available funds for the project were exhausted and the work ceased." (Citations omitted; emphasis in original; footnotes in original; footnote added; footnotes omitted.)

In its complaint, the plaintiff alleged a single count of breach of contract by the defendant. Specifically, the plaintiff alleged that, via a letter dated January 4, 2016, it had declared the defendant to be in default of the contract and had given the defendant seven days' notice that the defendant's employment under the contract was terminated. The complaint further alleged that the defendant breached the parties' contract in one or more of the ways set forth in the January 4, 2016 termination letter, which stated that the defendant (1) had failed to complete its work under the contract in a timely manner; (2) had failed or refused to comply with pertinent laws, regulations and instructions of the engineer for the project; (3) anticipatorily breached material provisions of the contract; and (4) did not vigorously perform its obligations as required by article 2.1.2 of the contract.

In response, the defendant filed an answer and nine special defenses. The nine special defenses alleged that the plaintiff's action was barred, in whole or in part, by the following: (1) the failure of the complaint to state a claim for which relief could be granted; (2) unilateral mistake in the terms of the contract; (3) fraud in the inducement; (4) equitable estoppel; (5) unclean hands; (6) waiver; (7) a failure to mitigate damages; (8) a material breach of the contract by the plaintiff; and (9) the plaintiff's failure to comply with the conditions for termination of the contract. The defendant also filed a fourth amended, eight count counterclaim alleging, in count one, breach of contract for failure to pay; in count two, breach of contract for the plaintiff's delays in the performance of its work under the contract; in count three, wrongful termination; in count four, negligent misrepresentation; in count five, a violation of General Statutes § 52-557n (b) (8) by the plaintiff for failing to conduct a proper inspection of the property; in count six,[6] a violation of § 52-557n (b) (9) by the plaintiff for failing to detect or prevent pollution of the environment; in count seven, breach of the duty of good faith and fair dealing; and in count eight, unjust enrichment.[7]

In its lengthy memorandum of decision, the court found that the plaintiff had established its claim for breach of contract and had suffered damages. After examining and rejecting the defendant's special defenses and the six remaining counts of its counterclaim, the court addressed the issue of damages. The court found

that article 2, § 2.1.1 of the contract was a valid provision for liquidated damages, rather than a penalty. It further found that, although the plaintiff had presented considerable evidence of its actual and consequential damages, the plaintiff could not claim both liquidated damages and actual and consequential damages, as the liquidated damages provision of the contract did not "allow an independent claim for actual and consequential damages." The court concluded that the plaintiff was "limited in its claim of damages to those attributable under its liquidated damages provision, article 2, § 2.1.1. Although such damages are often typically determined by when the job is finally completed by the breaching party, here, the plaintiff dismissed the defendant from the job. Costello was hired to finish the job, but because of the defendant's interaction with the EPA and the subsequent additional work and testing, it was unable to do so, as the funds available to the plaintiff to complete the project were exhausted. Although the job was never completed, the plaintiff has not sought liquidated damages beyond 260 days (adjusted to 254 days), which falls shortly after Costello received notice of the EPA's approval of the CWP. Thus, the total amount of liquidated damages due the plaintiff is found to be $508,000."

Next, the court addressed the retainage[8] held by the plaintiff. Pursuant to General Statutes § 49-41b, the amount of retainage held by a municipality in any public work contract is limited to 5 percent of any periodic or final payment due a general contractor. In the present case, under the contract the plaintiff was entitled to retain 10 percent "of each estimate until final completion and acceptance of all work covered by [the] contract." The court found that $18,628, which represented 10 percent of the cost of the work deemed completed by the defendant, was held by the plaintiff as retainage. The court explained that, although that amount comported with the terms of the contract agreed to by the parties, they were, nevertheless, bound by the terms of the statute. Accordingly, the court concluded that the correct amount of retainage held should have been $9314, and it set off the excess retainage against the amount due the plaintiff in liquidated damages, which resulted in an award in the amount of $498,686. The remaining retainage, $9314, was credited toward the plaintiff's damages, which resulted in a further reduction in the award due the plaintiff to $489,372. Judgment was rendered in favor of the plaintiff on its breach of contract claim in that amount. This appeal followed. Additional facts and procedural history will be set forth as necessary.

I

THE DEFENDANT'S APPEAL

On appeal, the defendant claims that (1) the court misapplied state and federal environmental regulations,

(2) the court erred in not finding that the contract was impossible to perform, (3) the court improperly determined that the plaintiff lawfully had terminated the contract, and (4) evidence of certain change orders executed by the plaintiff in connection with its contract with Costello, pursuant to which the plaintiff had agreed to modify terms of that contract, constituted admissions that the plaintiff's contract with the defendant was defective and could not be performed by the defendant as written.

Before we address the defendant's claims, we first set forth our well established standard of review in cases involving the issue of contract interpretation.[9] "The elements of a breach of contract claim are the formation of an agreement, performance by one party, breach of the agreement by the other party, and damages. . . . The interpretation of definitive contract language is a question of law over which our review is plenary. . . . By contrast, the trial court's factual findings as to whether and by whom a contract has been breached are subject to the clearly erroneous[10] standard of review and, if supported by evidence in the record, are not to be disturbed on appeal." (Citations omitted; footnote added; internal quotation marks omitted.) *CCT Communications, Inc.* v. *Zone Telecom, Inc.*, 327 Conn. 114, 133, 172 A.3d 1228 (2017). "[T]he intent of the parties [to a contract] is to be ascertained by a fair and reasonable construction of the written words and . . . the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract. . . . Where the language of the contract is clear and unambiguous, the contract is to be given effect according to its terms. A court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity . . . . Similarly, any ambiguity in a contract must emanate from the language used in the contract rather than from one party's subjective perception of the terms. . . . [T]he mere fact that the parties advance different interpretations of the language in question does not necessitate a conclusion that the language is ambiguous. . . . If a contract is unambiguous within its four corners, intent of the parties is a question of law requiring plenary review. . . . When the language of a contract is ambiguous, the determination of the parties' intent is a question of fact, and the trial court's interpretation is subject to reversal on appeal only if it is clearly erroneous." (Internal quotation marks omitted.) *Assn. Resources, Inc.* v. *Wall*, 298 Conn. 145, 183, 2 A.3d 873 (2010).

Moreover, "[c]ourts do not unmake bargains unwisely made. Absent other infirmities, bargains moved on calculated considerations, and whether provident or improvident, are entitled nevertheless to sanctions of the law. . . . Although parties might prefer to have the court decide the plain effect of their contract contrary

to the agreement, it is not within its power to make a new and different agreement . . . ." (Internal quotation marks omitted.) *Detar* v. *Coast Venture XXVX, Inc.*, 74 Conn. App. 319, 323, 811 A.2d 273 (2002). "It also is settled that [t]he individual clauses of a contract . . . cannot be construed by taking them out of context and giving them an interpretation apart from the contract of which they are a part. . . . A contract should be construed so as to give full meaning and effect to all of its provisions . . . ." (Internal quotation marks omitted.) *FCM Group, Inc.* v. *Miller*, 300 Conn. 774, 811, 17 A.3d 40 (2011).

A

The defendant's first claim is that the court misapplied state and federal environmental laws. Specifically, the defendant focuses on the court's statement, which it characterizes as erroneous, that, "[a]t the heart of the dispute between the parties is whether the plaintiff was obligated to do sampling of the structural steel for PCBs under the terms of the contract, of which the September 1, 2015 EPA approval letter was a part." The defendant claims, instead, that its dispute with the plaintiff "was about the obligation to characterize the waste coming off the site based on the EPA regulations and state law, not the contract." The defendant further claims that the court, by focusing on the contract, "misapplied the state and federal regulatory scheme as it pertains to cleanup projects affecting regulated PCB contamination," and that, by "focusing on the steel, it disregarded the other PCB contaminated waste revealed by the EPA imposed testing, the requirements of General Statutes § 22a-467, and the effect of EPA regulations."

For example, the defendant asserts that the notification provided by the plaintiff to the regulators was inadequate and did not comply with 40 C.F.R. § 761.61 (a) (3) because the plaintiff, by not testing various PCB contaminated materials, did not provide all required information. As a result, the defendant claims that the notification "did not provide authorization to perform work affecting undisclosed regulated waste," nor did the approval letter "authorize the [plaintiff] to perform work on undisclosed waste." The defendant also claims that the plaintiff disregarded the requirements of § 22a-467 because it never had a permit to remediate the waste from the site.

The defendant's claims are based on its assertion that "[t]he state and federal environmental regulatory schemes both articulate a stringent policy preventing the disturbance of PCB contaminated waste unless and until the nature and extent of the contamination is determined and disclosed to the regulators, and they approve the plan for remediation and disposal of regulated waste." In support of this proposition, the defendant cites to 40 C.F.R. § 761.61 (a) (2), which provides in relevant

part that "[a]ny person conducting self-implementing cleanup of PCB remediation waste must characterize the site adequately . . . ."[11] According to the defendant, the plaintiff, by mischaracterizing the steel beams as nonporous and by failing to paint chip sample the structural steel prior to submitting its plan for approval by the EPA, did not adequately characterize the site and thereby violated 40 C.F.R. § 761.61 (a) (2).

The defendant's claims of violations by the plaintiff of state and federal statutes and regulations can be distilled to one central claim, namely, that the plaintiff, prior to entering into the contract with the defendant, should have tested and analyzed samples of all of the waste at the site in order to be able to characterize the site adequately. As a result of the plaintiff's failure to do so, the defendant alleges that the information provided to the EPA was "limited or false," as it did not cover the undisclosed contaminated waste. Thus, according to the defendant, the Notification and approval letter from the EPA could not and did not provide authorization to perform work on the undisclosed waste, which precluded the defendant from performing any such work until the plaintiff performed the necessary testing and the EPA provided the necessary authorization. We disagree and conclude that the defendant's claims are belied by the court's findings, which are supported by the record.

1

First, from our review of the record, it does not appear that the defendant raised its claim before the court that the plaintiff lacked proper authorization from the EPA to perform work on the undisclosed waste at the site, as it was not mentioned in the defendant's posttrial brief nor did the court address it in its memorandum of decision. Rather, the defendant argued at trial that the plaintiff's mischaracterization of the steel made it impossible for the defendant to perform under the contract and that the plaintiff breached the contract by failing to characterize the steel properly. This court, therefore, will not address the issue of the adequacy of the EPA approval letter authorizing the plaintiff to commence work on phase III of the project, as that issue was not raised before or decided by the trial court. See *Lebanon Historical Society, Inc.* v. *Attorney General*, 209 Conn. App. 337, 351 n.12, 268 A.3d 734 (2021) (declining to review claim that was not distinctly raised before or decided by trial court). Moreover, because the court did not reference § 22a-467 in its decision, nor did the defendant raise any claim pursuant to that statute before the court in its special defenses, counterclaim or posttrial brief, we also decline to address the defendant's claim that the plaintiff, and the court, disregarded the requirements of § 22a-467. See id.

2

The following facts are relevant to the defendant's claims that the plaintiff did not characterize the site adequately and was required under the contract to paint chip test the steel beams before the defendant could perform any work at the site. The plaintiff submitted a notification to the EPA seeking approval of a proposed plan to address the removal of PCB contaminated building materials from the project site. In response, on September 1, 2015, the EPA issued an approval letter authorizing the plaintiff to move forward with phase III of the project subject to the conditions set forth in the letter and two attachments. The first attachment required the plaintiff to provide to the EPA "a certification signed by its selected abatement/demolition contractor, stating that the contractor(s) has read and understands the Notification, and agrees to abide by the conditions specified in [the] [a]pproval . . . ." The second attachment included documents and correspondence reviewed by the EPA prior to the issuance of its approval, which, as the court found, included "discussions of PCB contamination of various materials including overhead cranes and steel beams." By e-mail, dated September 3, 2015, the defendant, as the contractor, provided the certification required by the approval letter, stating that it read and understood the cleanup and disposal plan for the project site and agreed to abide by the conditions set forth by the EPA in the approval letter, which included compliance with EPA regulations under 40 C.F.R. § 761 relative to the removal and abatement of PCBs. Subsequently, the parties entered into the contract, and, by letter dated September 14, 2015, the plaintiff provided the defendant with a notice to proceed as required under the contract.

As stated previously in this opinion, the court found that the parties' dispute centered on whether the contract obligated the plaintiff to do paint chip sampling of the structural steel to determine the presence of PCBs at an improper level. In addressing this issue, the court found that the testimony of Goldblum, the defendant's president, and Lawrence Kurt, who prepared the CWP for the defendant, made "clear that the defendant's position was that paint chip sampling of the steel was necessary for it to be sold to scrap dealers as recyclable material." The general truth of that statement, however, is irrelevant because the court found that the contract does not specify any requirement for paint chip testing, and our examination of the contract confirms that finding. Additionally, the court found the testimony of the plaintiff's expert witnesses "to be credible[12] and of greater weight than that of the defendant's expert"; (footnote added); on the issue of whether it is customary to require paint chip sampling under circumstances similar to those in the present case.[13] The court further found that, "[w]ith respect to any testing that might have been required to comply with any regulatory provisions under 40 C.F.R. § 761, the defendant

acknowledged that it had such an obligation when it expressly certified in its letter on September 3, 2015, that it had read and understood the terms of the EPA's Notification and agreed to abide by the specifications set out in the approval letter." The court also specifically found that "there is no express statement [in the contract] that the steel is not contaminated," which undermines the primary basis for the defendant's argument about the plaintiff's alleged mischaracterization of the site.[14] Finally, the court found that "the plaintiff performed its obligations under the contract."

We conclude that the court's findings are supported by the clear and unambiguous provisions of the contract. For example, the provision of the contract governing the transportation and disposal of hazardous materials requires that "[a]ll labor, materials, tools, equipment, services, *testing*, insurance, and incidentals which are necessary or required to perform the work in accordance with applicable governmental regulations, industry standards and codes, and these specifications, *shall be provided by the Contractor*." (Emphasis added.) The contract further provides that "[a]ll characterization sampling and analysis for disposal shall be conducted by the CONTRACTOR, with supervision from the ENGINEER, where indicated," and that "[t]he Contractor is responsible for verifying actual locations and quantities of the items with hazardous/regulated material/waste constituents and for their proper handling and disposal." Moreover, neither the contract nor the approval letter required the plaintiff to do paint chip sampling. As the court properly found, the contract, when viewed as a whole, "overwhelmingly placed the obligation for the testing, handling and processing of the materials on the site upon the defendant." Indeed, as the court observed, "[f]rom the broadest perspective, while the defendant argues that it was the plaintiff who was responsible for managing and disposing of the PCBs on the site, the very purpose of the plaintiff awarding the contract to the defendant was to have it do that very work," and "[w]hat the defendant viewed as extra work with respect to the testing and treatment of the structural steel was reasonably within the scope of the work called for by the contract and the EPA approval letter."

In the present case, the court correctly found that the contract "overwhelmingly placed the obligation for the testing, handling and processing of the materials on the site upon the defendant." The court also thoroughly discussed the risks assumed by the defendant under the contract and found that the plaintiff was not obligated to test the waste "except in the context of doing verification testing, which the parties do not dispute. All characterization of the waste that had previously been done in phases I and II of the project, which work had been approved by the EPA, was disclosed to the defendant as part of the bid process and within the contract docu-

ments. The contract specifically addressed the characterization of the waste . . . [and required it to be conducted by the contractor]. . . . The fact that the defendant may not have accounted for the potential contamination or testing of some structural steel, which had been thought to have been recyclable, and therefore resulted in the need for additional work both in terms of time and labor, was a risk that it contractually bore." (Citation omitted.) The court further stated that "[t]he contract expressly made clear that the risk of the condition of the materials being different than anticipated was solely on the contractor. Hence, if it turned out that the assumption as to the recyclability of the steel was wrong, the risk as to the quantity and value of any recyclable steel was to be borne by the [defendant]. Both the original bid form and the proposed/executed contract documents so stated." These findings are amply supported by the clear language of the contract and the documents related thereto that were submitted into evidence. The defendant's claim on appeal that the plaintiff was required to do the testing that the defendant, itself, had contracted to perform simply lacks merit.

3

Although, on appeal, the defendant casts the primary issue as involving the plaintiff's obligation to characterize waste in accordance with the EPA regulations and state law, this case involves a claim for breach of contract, and the defendant has not challenged many of the court's findings and conclusions related to the plaintiff's breach of contract claim nor has it provided a clear explanation as to how its claims concerning the EPA regulations circumvent the court's findings regarding the contract. As we stated previously, "[t]he elements of a breach of contract claim are the formation of an agreement, performance by one party, breach of the agreement by the other party, and damages." (Internal quotation marks omitted.) *CCT Communications, Inc.* v. *Zone Telecom, Inc.*, supra, 327 Conn. 133. In determining whether those elements had been satisfied, the court thoroughly, and properly, analyzed the provisions of the contract.

The defendant's claim that this case concerns the issue of the plaintiff's obligation to characterize the waste based on the requirements of certain EPA regulations, not on the pertinent language of the contract, is undercut by the defendant's arguments before the court and in its posttrial brief, which is replete with arguments relating to the provisions of the *contract*. Although, in making those arguments, the defendant referred to EPA regulations, its claims at trial were premised on the contract, and the defendant relied on those regulations as a basis for its claim that the plaintiff breached the contract. On appeal, however, the defendant, without reference to the contract and as an excuse to escape

its contractual obligations, argues that the plaintiff's conduct constitutes a violation of those regulations and that the court erred in failing to find such a violation. The defendant cannot take one path at trial and, when that fails, choose another on appeal. See *Bligh* v. *Travelers Home & Marine Ins. Co.*, 154 Conn. App. 564, 577, 109 A.3d 481 (2015) ("[o]rdinarily appellate review is not available to a party who follows one strategic path at trial and another on appeal, when the original strategy does not produce the desired result" (internal quotation marks omitted)). The defendant's claim, therefore, fails.

4

Finally, it is also important to note the court's finding that, "[i]n this transaction, the defendant was a sophisticated and experienced party in a highly specialized area of work, which had, or had available to it if it wished, the advice of consultants or counsel prior to entering into the transaction. In fact, the defendant's president, Goldblum, is himself an attorney. In the bid documents, the defendant provided a detailed and extensive list of its experience in the field of demolition, remediation and abatement, referencing fifty-three projects it had completed or [was] actively working on between 2008 and 2014." The court further found that the defendant "was given every opportunity to address any issues it had with the proposed terms and interpretation of the contract prior to its execution," that "[i]t was not an innocent [party] that was somehow unknowingly duped into entering into an agreement of which it had no real knowledge or understanding," and that, even though the court understood "the source of the frustration and dismay of the defendant as to the condition of the property being other than that which it had assumed," under the contract, the defendant bore the risk of its failure to account "for the potential contamination or testing of some structural steel which had been thought to have been recyclable . . . ."

With the benefit of hindsight, the defendant, in an effort to shift the burden and responsibility for site testing from it to the plaintiff, effectively is requesting this court to rewrite its contract with the plaintiff, which would be contrary to the well established principle that "parties are free to contract for whatever terms on which they may agree. This freedom includes the right to contract for the assumption of known or unknown hazards and risks that may arise as a consequence of the execution of the contract. Accordingly, in private disputes, a court must enforce the contract as drafted by the parties and may not relieve a contracting party from anticipated or actual difficulties undertaken pursuant to the contract, unless the contract is voidable on grounds such as mistake, fraud or unconscionability." *Holly Hill Holdings* v. *Lowman*, 226 Conn. 748, 755–56, 628 A.2d 1298 (1993); see also *Coppola Construction Co.* v. *Hoffman Enterprises Ltd. Partnership*, 157 Conn.

App. 139, 159, 117 A.3d 876 ("[C]ourts do not unmake bargains unwisely made. . . . Although parties might prefer to have the court decide the plain effect of their contract contrary to the agreement, it is not within its power to make a new and different agreement; contracts voluntarily and fairly made should be held valid and enforced in the courts." (Internal quotation marks omitted.)), cert. denied, 318 Conn. 902, 122 A.3d 631 (2015), and cert. denied, 318 Conn. 902, 123 A.3d 882 (2015). Although "the defendant may have used a mistaken basic assumption in making its bid and entering into the contract," that does not permit this court or the trial court to rewrite the contract or to relieve the defendant of its obligations thereunder, especially when the defendant is an experienced and sophisticated commercial party with respect to the type of work covered by the contract, rather than an unsophisticated party that was misled or deceived into entering into the contract, the circumstances of which, the court concluded, were not unconscionable.

B

The defendant next claims that the court erred in not finding that the contract was impossible to perform. We decline to review the claim.

This court previously has addressed the defense of impossibility, stating: "Practice Book § 10-50 provides that [f]acts which are consistent with [the claimant's allegations] but show, notwithstanding, that the plaintiff has no cause of action, must be specially alleged. . . . The defense of impossibility does not aim to establish the absence of a breach of the contract; rather it assumes breach and instead seeks to show that a party is excused from performance because at the time [the] contract [was] made, [his] performance under it is impracticable without his fault because of a fact of which he has no reason to know . . . . 2 Restatement (Second), Contracts, Existing Impracticability or Frustration § 266, p. 338 (1981). Accordingly, such defense must be specially pleaded." (Citation omitted; internal quotation marks omitted.) *Howard-Arnold, Inc.* v. *T.N.T. Realty, Inc.*, 145 Conn. App. 696, 711–12, 77 A.3d 165 (2013), aff'd, 315 Conn. 596, 109 A.3d 473 (2015).

In the present case, the plaintiff argues that this court should decline to review the defendant's impossibility claim because it was not pleaded as a special defense. It claims that, because the defendant failed to plead a special defense of impossibility, the court did not undertake the necessary analysis of such a claim, nor did it make findings thereon, and, thus, it could not have erred in failing to find that the defendant's performance under the contract was impossible. In opposition, the defendant argues that the issue of impossibility is properly before this court. Specifically, the defendant claims that it raised the claim in its posttrial brief and that the court addressed the issue in its memorandum of

decision. We agree with the plaintiff.

First, we note that the defendant has not addressed in its reply brief the issue raised by the plaintiff concerning the defendant's failure to plead impossibility as a special defense, which, by itself, is fatal to its claim, as our case law is clear that impossibility must be pleaded as a special defense. See id. The court, therefore, could not have erred in failing to make a finding on an issue that was not properly before it. Moreover, the defendant relies on its claims that the court addressed the issue in its decision and that the defendant raised the issue in its posttrial brief as part of its argument that the plaintiff materially had breached the contract. Our review of the court's decision, however, demonstrates that, although the court referenced a number of the defendant's claims, including the claim that the plaintiff's mischaracterization of the steel made it impossible for the defendant to perform under the contract, the court did not make any express findings regarding whether the contract itself was impossible to perform. The only finding regarding impossibility made by the court was its finding that, given the course of events that had transpired, as of December, 2015, it would have been impossible for the defendant to complete the work in a timely manner; the court never made a finding that it would have been impossible for the defendant to perform the work under the contract in the first place beginning in September, 2015, as claimed by the defendant on appeal.

Additionally, even if the issue of whether it was impossible for the defendant to perform its obligations under the contract was properly before the court, because the court failed to make any findings as to that issue, we would have to speculate as to whether the court rejected the claim or simply overlooked it. It was incumbent on the defendant to seek an articulation of the court's decision as to its failure to make a finding on a claim the defendant alleges was properly before the court. In the absence of such an articulation, the record is inadequate for us to review the claim. See *McCarthy* v. *Chromium Process Co.*, 127 Conn. App. 324, 335, 13 A.3d 715 (2011) ("It is well established that [i]t is the appellant's burden to provide an adequate record for review. . . . It is, therefore, the responsibility of the appellant to move for an articulation or rectification of the record where the trial court has failed to state the basis of a decision . . . to clarify the legal basis of a ruling . . . or to ask the trial judge to rule on an overlooked matter. . . . In the absence of any such attempts, we decline to review this issue." (Internal quotation marks omitted.)).

C

The defendant next claims that the court improperly determined that the plaintiff lawfully had terminated the contract.[15] In support of this claim, the defendant

argues that "[a] party to a contract already in default cannot terminate the other," and that the plaintiff "was clearly in default by the end of November when the CWP was rejected." Thus, according to the defendant, "[u]nless and until the CWP was approved, [the defendant] had no authority to perform any work that affected PCB contaminated waste." We are not persuaded.

We first note that the court did not make an express finding that the plaintiff lawfully had terminated the contract. Such a finding, however, can be inferred from the court's rejection of count three of the defendant's counterclaim, which alleged that the plaintiff wrongfully had terminated the defendant from the job. Although the defendant appears to be challenging that determination, its very limited briefing on the issue fails to address the court's determination that the defendant had failed to establish the allegations of its wrongful termination claim in count three of its counterclaim. We, therefore, do not undertake an analysis of the court's decision relating thereto.

The defendant's claim that the plaintiff did not lawfully terminate the contract is premised on a faulty assumption, namely, that the plaintiff was in default under the contract. The record does not support that assertion, and the court made no such finding of default by the plaintiff. In fact, the court expressly found that the plaintiff had performed its obligations under the contract and that there was ample evidence of the defendant's breach. Specifically, the court stated: "First, the contract contained a 'time is of the essence' clause requiring the defendant to finish the job on or before February 1, 2016. TRC had granted a six day extension to allow for the testing of the expansion joint caulking for PCB contamination as requested by the EPA, which moved the deadline back to February 7, 2016. There was credible testimony from Doubleday, Zarba and [Richard] McManus that the defendant would not have been able to meet that deadline. Collectively they cited several factors, including, but not limited to: (1) the defendant waiting seven weeks (forty-eight days) before obtaining a demolition permit for the job site; (2) the multiple delays in preparing an acceptable CWP, which included over a month's delay while the defendant hired a consultant to review the plan; (3) the defendant's election to demobilize from the site on or about November 20, 2015; (4) McManus' opinion that the milling of the concrete called for in the contract would take sixty-nine days as opposed to the thirty days the defendant had estimated; (5) the ongoing dispute over who was responsible for the testing of the steel for PCB contamination despite the plaintiff's continued insistence that it was the defendant's obligation to do so; (6) the defendant's delay between at least November 3, 2015, and November 27, 2015, in submitting a written change order request based on its repeated oral claim

that several of the EPA requirements specified in the approval letter were the basis for a change in the contract despite TRC's equally repeated response that such a claim would only be considered if submitted in writing pursuant to the contract; (7) the failure to submit a revised [health and safety plan]; (8) the failure to submit a demolition work plan; (9) the November 20, 2015 letter from the defendant and statement at the December 8, 2015 job meeting advising the plaintiff that the defendant would not proceed with any further work on the job until a CWP was done; (10) its statement in that same letter and at the job meetings on November 24, 2015, December 1, 2015, and December 8, 2015, that it would not perform any work if [it] was required to sample the steel; (11) that the issues on the characterization of the steel and the paint chip testing were still to be resolved; (12) that less than 10 percent of the work called for on the project had been completed as of both December of 2015 and the date of the termination; and (13) based on its December 15, 2015 letter to the plaintiff claiming a ninety-four day delay due to plaintiff's actions and the defendant's own proposed revised project schedule that called for a completion date of May 4, 2016. Given these facts, it is clear that it would have been impossible for the defendant to have finished the job by February 6, 2016." (Footnotes omitted.)

These findings provide ample support for the court's determination that, in December, 2015, the defendant could not have finished the job in a timely manner as required under the contract. Therefore, the defendant's challenge to the court's implicit determination that the plaintiff lawfully had terminated the contract is unavailing.[16]

D

The defendant next claims that evidence of certain change orders executed by the plaintiff in connection with its contract with Costello, pursuant to which the plaintiff had agreed to modify terms of that contract, constituted admissions that the plaintiff's contract with the defendant was defective and could not be performed by the defendant as written. We disagree.

In its memorandum of decision, the court found that Costello submitted eleven change order requests during the course of its work on the project and that most of those requests were approved by TRC. The court further stated: "The defendant has argued that the court should also consider the conduct of the plaintiff in its handling of the similar contract with Costello following the rebid of the project. The defendant argues that, as to Costello, TRC allowed change orders similar to those asked for [by the defendant] and denied to the defendant by TRC, and that those change orders often revolved around the requirements for testing and decontamination. This, the defendant contends, is an admission on the part of the

plaintiff as to the actual intent of the contract, which was that the original obligation for the testing of PCB contamination was that of the plaintiff. To this end, the defendant cites *Putnam Park Associates* v. *Fahnestock & Co.*, 73 Conn. App. 1, 10–11, 807 A.2d 991 (2002), for the general proposition that a court may use the parties' actions as an aid to determine the meaning of the contract. While that general proposition is true, the defendant's reference to the case is misplaced, as the defendant asks the court to look at the actions of the plaintiff with respect to a different party on a different, albeit similar, contract. . . . The plaintiff's actions do not involve the same two parties and, therefore, the principle cited is inapplicable." (Citation omitted.) We agree with the court.

The fatal flaw in the defendant's argument is its failure to acknowledge the basis for the change orders sought by Costello. Approximately eight months after the defendant's contract with the plaintiff was terminated, the defendant directly contacted the EPA by e-mail regarding certain paint chip sampling requested by the defendant as part of this litigation that was to be performed on the site in accordance with an order of the trial court dated August 19, 2016.[17] This resulted in a series of e-mails and telephone calls between the defendant and representatives of the EPA and had the effect of interrupting the work being performed by Costello. Subsequently, TRC submitted to the EPA a plan proposed by Costello for PCB sampling, after which a series of correspondence between the plaintiff and the EPA followed. Those exchanges included "a comment by the EPA that should the paint chip samples sought by the defendant (in the court action) reveal PCBs in the paint, a change to the decontamination plan might be necessary." The results of that paint chip sampling did prompt the EPA to require additional testing of the steel beams and other materials, including testing of roofing material, which caused additional expenses and delayed the project. Significantly, the court found that, "[a]t no time before the defendant unilaterally intervened by contacting the EPA with the court ordered paint chip sample results on November 21, 2016, did the EPA expressly require the plaintiff to do any paint chip sampling and provide the results thereof."

Following its examination of the language of the contract and the approval letter, and its consideration of the expert testimony presented,[18] the court found that paint chip sampling was not required to be done by the plaintiff under its contract with the defendant. That finding is supported by the record and is not clearly erroneous. The defendant's claim, therefore, that the change orders granted to Costello in connection with the additional paint chip testing requirements imposed by the EPA, which were not part of the defendant's contract with the plaintiff, constituted an admission by the plaintiff that its contract with the defendant could

not be performed without such testing is contrary to the record and fails.

## II

### THE CROSS APPEAL

In its cross appeal, the plaintiff challenges the court's award and calculation of damages. Specifically, the plaintiff claims that the court erred in its award and calculation of damages with respect to the following: (1) "the court interpreted the contract's liquidated damages . . . provision . . . as the only measure of damages available for all elements of the [plaintiff's] loss when that provision is not the exclusive measure of damages for breach and does not preclude the award of the [plaintiff's] nondelay damages, inclusive of direct and consequential damages unrelated to delay in [the project's] completion"; (2) "there is no lawful basis for limiting per diem [liquidated damages] to 254 days"; and (3) "the court erred in its prospective calculation of damages by not taking into account the $167,652 paid by the [plaintiff] to [the defendant] when it compared [the defendant's] and Costello's contracts for the purpose of determining the [plaintiff's] completion costs."[19] We agree with the plaintiff's first claim.

We first set forth the following findings concerning the issue of damages made by the court in its memorandum of decision: "[T]he plaintiff has submitted a summary of damages with supporting documentation claiming an amount due of $1,855,936. . . . Categorically, the claimed damages fall into three areas. First, the difference in the contract price between the defendant and Costello for the job to be done. Second, additional expenses for the rebidding of the job and the engineering support that went with it. Third, project damages for both contractual liquidated damages and additional work the plaintiff was required to do as a result of the defendant's unilateral communications with the EPA following its dismissal from the job.

"As to the first category, the difference in the contract price, the defendant's accepted bid in June, 2015, was $2,713,950. Upon rebid in March, 2016, Costello was awarded the contract for $2,962,207. The difference is an additional cost of $248,257. . . . The bid forms provided to the bidders between the original bid and the rebid were identical but for the assumption of the credit for salvageable steel. The original bid form estimated 1000 tons and the rebid form estimated 2400 tons. Both indicated that the quantity and value of the salvageable steel was at the contractor's sole risk/reward.

"As to the second category, the additional expenses for the rebidding of the job and the engineering support that went with it, the plaintiff claims payments of $167,652 made to the defendant, payments of $92,300 toward construction support in 2015, the escalation of unit prices resulting in an additional cost of $17,913,

payments of $47,230 toward the support of the rebid process, $23,800 for the disposal of bags with asbestos containing material that had been left on-site by the defendant, $10,259 for fencing, and $583 for advertisement of the project rebid. These expenses total $359,737. The court finds evidentiary support for most of the claimed expenses. However, the expense of $167,652 is not properly claimed as damages as these were payments for work done by the defendant, which had been approved by TRC following the submission of the defendant's first two pay applications. . . . Accounting for that payment, the total expenses claimed are $192,085.

"As to the final category, project damages for both contractual liquidated damages and the additional work the plaintiff was required to do as a result of both the court action and the defendant's communications with the EPA following its dismissal from the job, the plaintiff claims a total amount due of $1,247,942. The largest component of the figure comes from the claim of liquidated damages in the amount of $520,000 for the 260 day period commencing from February 1, 2016, at the rate of $2000 per day. In order to complete the work that remained to be done after the defendant's dismissal, Costello's March 31, 2016 bid of $2,962,207 was accepted by the plaintiff. . . . Costello later commenced work on the project on essentially the same terms as the defendant. Following Costello's preparation of a CWP and other minor work, it received notice from the plaintiff on October 5, 2016, that the EPA had approved the CWP and [that it] could commence work in earnest. . . . However, in the fall of 2016, additional work was required to be done on the project, which included additional PCB [testing] and . . . testing [of asbestos containing materials], decontamination, shearing and sizing of steel beams, site maintenance, and disposal of additionally identified contaminated waste and other tasks. These specific costs were reflected in, but not limited to, change orders [numbers] 3, 5, 6, 7, 8, 9, 10 and 11. . . . All of the other additional work was necessary as a result of Insall's correspondence on behalf of the defendant to the EPA between September 1, 2016, and November 21, 2016, long after the defendant had been dismissed from the job. That correspondence raised the issue of paint chip testing for PCB contamination at the site and claimed that other debris had come in contact with contaminated soil. This necessitated stopping work on the project from December 5 to December 16, 2016, and eventually resulted in at least an additional 200 paint chip tests. . . . Some of the other damages claimed, outside of the change orders, related to the paint study that had been initiated but not completed, and the potential for additional disposal costs related to the steel. The total amount claimed as to all of these actual and estimated costs is $1,247,942.

"With respect to that third category, the plaintiff's claim of liquidated damages for the defendant's failure to timely complete the job is for 260 days commencing from February 1, 2016, to October 19, 2016. . . . The contract called for completion of the work by that date (i.e., within 140 days). Article 2, § 2.1.1 of the contract states: 'Failure of the Contractor to meet this established timeframe will result in liquidated damages being assessed in the amount of $2,000/day for each and every calendar day beyond the contract time limit.' . . . In this instance, the plaintiff claims a total of $520,000. As previously noted, the court has found that there was an extension of the contract to February 7, 2016. Therefore, the claim must be adjusted to a commencement date of February 7, 2016, for a revised total of 254 days at $2000 per day for a total of $508,000." (Citations omitted.)

The court next examined the liquidated damages provision of the contract and determined that it was a valid, enforceable provision of the contract, as it met the three criteria necessary to establish that the provision is one for liquidated damages and not a penalty. The court, after citing the principle set forth in *Hanson Development Co.* v. *East Great Plains Shopping Center, Inc.*, 195 Conn. 60, 64, 485 A.2d 1296 (1985), that "a seller may not retain a stipulated sum as liquidated damages and also recover actual damages," concluded that the plaintiff was "limited in its claim of damages to those attributable under its liquidated damages provision, article 2, § 2.1.1. Although such damages are often typically determined by when the job is finally completed by the breaching party, here the plaintiff dismissed the defendant from the job. Costello was hired to finish the job, but because of the defendant's interaction with the EPA and the subsequent additional work and testing, it was unable to do so as the funds available to the plaintiff to complete the project were exhausted. Although the job was never completed, the plaintiff has not sought liquidated damages beyond 260 days (adjusted to 254 days), which falls shortly after Costello received notice of the EPA's approval of the CWP. Thus, the total amount of liquidated damages due the plaintiff is found to be $508,000.

"As to any finding of damages, it remains for the court to address the retainage[20] held by the plaintiff in excess of the statutory limits set forth in . . . § 49-41b,[21] as noted in the discussion of count one of the defendant's counterclaim. That statute limits the amount of retainage held by a municipality in any public work contract to 5 percent of any periodic or final payment due a general contractor. In this instance, article 4, § 4.1.5 of the contract, entitled 'Retainage,' states, '[T]he [plaintiff] shall retain ten percent (10%) . . . of each estimate until final completion and acceptance of all work covered by this contract.' . . . A review of

the pay applications submitted by the defendant and approved by TRC show that $18,628 was held as retainage, which represented 10 percent of the amount of the work deemed completed by the defendant. . . . The amounts withheld by the plaintiff comport with the terms of the contract, which both parties had voluntarily and mutually agreed to. Nonetheless, they are both bound by the statute. As a result, the correct amount of retainage held should have been $9314. Accordingly, the court will set off the excess retainage of $9314 against the amount due the plaintiff, bringing the total damage award to $498,686. The remaining retainage held by the plaintiff in the equal amount of $9314 shall be credited toward the plaintiff's damages pursuant to article 5, § 5.1. That provision allows the plaintiff to withhold any further payments to the contractor when it has failed to complete the work within the time period called for by the contract. Allowing this second amount as a credit to the defendant, given that the amounts are already in the possession of the plaintiff, an additional adjustment of $9314 is made to the award of damages, further reducing the total amount due the plaintiff to $489,372." (Citations omitted; footnotes added.) In making those findings, the court relied on the testimony of Doubleday, Zarba and Mike Costello, along with other documentary evidence submitted by the plaintiff.

Before we address the merits of the claims on the cross appeal, we set forth our standard of review. "As a general rule, in awarding damages upon a breach of contract, the prevailing party is entitled to compensation which will place [it] in the same position [it] would have been in had the contract been properly performed. . . . Such damages are measured as of the date of the breach. . . . For a breach of a construction contract involving defective or unfinished construction, damages are measured by computing either (i) the reasonable cost of construction and completion in accordance with the contract, if this is possible and does not involve unreasonable economic waste; or (ii) the difference between the value that the product contracted for would have had and the value of the performance that has been received by the plaintiff, if construction and completion in accordance with the contract would involve unreasonable economic waste." (Internal quotation marks omitted.) *Naples* v. *Keystone Building & Development Corp.*, 295 Conn. 214, 224, 990 A.2d 326 (2010); see also *Duffy* v. *Woodcrest Builders, Inc.*, 2 Conn. Cir. 137, 143, 196 A.2d 606 (1963) ("[i]n the case of a defaulting building contractor, the situation is normally that of recovering the reasonable cost of getting the work done by another" (internal quotation marks omitted)).

"The [injured party] has the burden of proving the extent of the damages suffered. . . . Although the [injured party] need not provide such proof with [m]athematical exactitude . . . the [injured party] must nev-

ertheless provide sufficient evidence for the trier to make a fair and reasonable estimate. . . . As we have stated previously, the determination of damages is a matter for the trier of fact. . . . Accordingly, we review the trial court's damages award under the clearly erroneous standard, under which we overturn a finding of fact when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *DeMattio* v. *Plunkett*, 199 Conn. App. 693, 721–22, 238 A.3d 24 (2020).

A

The plaintiff claims that the court erred in determining that the contract's liquidated damages provision was the exclusive measure of damages for breach of the contract. We agree.

We first set forth general principles governing liquidated damages. "The law is well established in this jurisdiction, as well as elsewhere, that a term in a contract calling for the imposition of a penalty for the breach of the contract is contrary to public policy and invalid, but a contractual provision fixing the amount of damages to be paid in the event of a breach is enforceable if it satisfies certain conditions. . . . A contractual provision for a penalty is one the prime purpose of which is to prevent a breach of the contract by holding over the head of a contracting party the threat of punishment for a breach." (Citations omitted.) *Berger* v. *Shanahan*, 142 Conn. 726, 731, 118 A.2d 311 (1955). "A provision for liquidated damages [on the other hand] . . . is one the real purpose of which is to fix fair compensation to the injured party for a breach of contract. In determining whether any particular provision is for liquidated damages or for a penalty, the courts are not controlled by the fact that the phrase liquidated damages or the word penalty is used. Rather, that which is determinative of the question is the intention of the parties to the contract. Accordingly, such a provision is ordinarily to be construed as one for liquidated damages if three conditions are satisfied: (1) The damage which was to be expected as a result of the breach of the contract was uncertain in amount or difficult to prove; (2) there was an intent on the part of the parties to liquidate damages in advance; and (3) the amount stipulated was reasonable in the sense that it was not greatly disproportionate to the amount of the damage which, as the parties looked forward, seemed to be the presumable loss which would be sustained by the contractee in the event of a breach of the contract."[22] (Internal quotation marks omitted.) *Tsiropoulos* v. *Radigan*, 163 Conn. App. 122, 127–28, 133 A.3d 898 (2016); see also *Banta* v. *Stamford Motor Co.*, 89 Conn. 51, 54, 92 A. 665 (1914) (" 'As a general rule parties are allowed

to make such contracts as they please, including contracts to liquidate and fix beforehand the amount to be paid as damages for a breach of such contracts; but the courts have always exercised a certain power of control over contracts to liquidate damages, so as to keep them in harmony with the fundamental general rule that compensation shall be commensurate with the extent of the injury. . . . When the nature of the engagement is such that upon a breach of it the amount of damages would be uncertain or difficult of proof, and the parties have beforehand expressly agreed upon the amount of damages and that amount is not greatly disproportionate to the presumable loss, their expressed intent will be carried out.' ").

Because the plaintiff's challenge to the court's interpretation of the liquidated damages provision in the contract as being the plaintiff's exclusive remedy for the defendant's breach of the contract involves a matter of contract interpretation, we set forth our well established standard of review governing such claims. "[W]here there is definitive contract language, the determination of what the parties intended by their contractual commitments is a question of law. . . . Because a question of law is presented, review of the trial court's ruling is plenary, and this court must determine whether the trial court's conclusions are legally and logically correct, and whether they find support in the facts appearing in the record. . . . [T]he intent of the parties [to a contract] is to be ascertained by a fair and reasonable construction of the written words and . . . the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract." (Citation omitted; internal quotation marks omitted.) *Detar* v. *Coast Venture XXVX, Inc.*, supra, 74 Conn. App. 322–23.

In the present case, liquidated damages are covered by article 2 of the contract. Article 2, § 2.1, which governs the time frame of the contract, provides: "The contract period is established from the Notice to Proceed issued by the Engineer for a period of 140 days, including weekends and holidays. The work should be substantially complete at that time, unless the Contractor has been granted an extension by methods defined and prescribed herein." That provision is followed by § 2.1.1, titled "Liquidated Damages," which provides: "Failure of the Contractor to meet this established timeframe will result in liquidated damages being assessed in the amount of $2,000/day for each and every calendar day beyond the contract time limit." Section 2.1.2 of article 2 further provides that time is of the essence[23] for the general performance of the contract and, additionally, that, "[i]n the event the Contractor fails to perform the work in a timely manner due to the Contractor's poor planning, financial status, errors in construction or any other reason directly attributed to the Con-

tractor's circumstances, the [plaintiff] may institute default proceedings against the Contractor to recover *damages* and *losses*." (Emphasis added.)

In making its determination that liquidated damages were the plaintiff's exclusive remedy under the contract, the court cited *Hanson Development Co*. v. *East Great Plains Shopping Center, Inc.*, supra, 195 Conn. 64, for the principle that "a seller may not retain a stipulated sum as liquidated damages and also recover actual damages." Specifically, the court stated: "Where the parties have entered into a voluntary agreement as to how to address any potential damages from a breach of contract, such agreement if validly entered into is to be enforced. Therefore, the plaintiff's claim for both liquidated damages and consequential damages is an attempt to have its cake and eat it too. In *Saturn Construction Co*. [v. *Dept. of Public Works*, Superior Court, judicial district of Hartford, Docket No. CV-93-0704690-S (October 17, 1994), in which the court found enforceable a liquidated damages provision in a state contract that provided for liquidated damages of $1000 per day for failure to complete a construction job in a timely manner], Judge Sheldon noted that it is possible, depending on the wording of the liquidated damages provision, to obtain both under narrow circumstances: '[A]lthough an unrestricted liquidated damages clause operates as a bar to the recovery of all actual or consequential damages for breach of the contract; *Camp* v. *Cohn*, 151 Conn. 623, 626, 201 A.2d 187 (1964); parties to a contract may choose to narrow the scope of their liquidated damages clause by clearly expressing that intention either in the language of the clause itself or in the remaining language of the contract.' For example, the clause could be limited to the loss of use of a proposed property. In the present case, interpreting the contract as a matter of law, the language of the liquidated damages clause is not limited in any way that would allow an independent claim for actual and consequential damages. The parties having agreed upon the terms of the liquidated damages clause, the court is not free to disregard it or read other terms into the contract."

We conclude that the court improperly determined that liquidated damages were the plaintiff's exclusive remedy under the contract. Our Supreme Court has "long . . . held that contracting parties may decide on a specified monetary remedy for the failure to perform a contractual obligation." *Bellemare* v. *Wachovia Mortgage Corp.*, 284 Conn. 193, 203, 931 A.2d 916 (2007). Moreover, "[p]arties to a contract may agree on the remedies available in the event of a breach of contract. If the language of the agreement discloses that the parties intended to limit the remedies to those stated, the agreement will be enforced and the party will be limited to the exclusive remedies outlined in the agreement. . . . A contract will not be construed to limit remedial

rights *unless there is a clear intention that the enumerated remedies are exclusive*." (Emphasis added; internal quotation marks omitted.) *International Marine Holdings, Inc.* v. *Stauff*, 44 Conn. App. 664, 676, 691 A.2d 1117 (1997). That principle is supported by the language of the Uniform Commercial Code and General Statutes § 42a-2-719 (1), under which the language of a limited remedy in a contract that is designed to be the sole exclusive remedy must be clearly expressed. See *Gaynor Electric Co.* v. *Hollander*, 29 Conn. App. 865, 871–72, 872 n.4, 618 A.2d 532 (1993).

The language of the contract in the present case does not support the court's conclusion that liquidated damages were the plaintiff's exclusive remedy. The liquidated damages provision in § 2.1.1 of article 2, which provides that the failure of the contractor to meet the time frame established therein will result in liquidated damages, clearly applies to damages resulting from delay; there is no language expressly stating that such damages are the plaintiff's exclusive remedy for a breach of the contract not related to the defendant's delay in performance, and the fact that the contract provided for liquidated damages caused by the defendant's failure to perform the work within the time frame set forth in the contract does not, by itself, demonstrate a clear intent that such delay damages are the exclusive remedy available to the plaintiff under the contract, which must be viewed in its entirety. See *Vaccaro* v. *Shell Beach Condominium, Inc.*, 169 Conn. App. 21, 49, 148 A.3d 1123 (2016) ("[t]he contract must be viewed in its entirety, with each provision read in light of the other provisions . . . and every provision must be given effect if it is possible to do so" (internal quotation marks omitted)), cert. denied, 324 Conn. 917, 154 A.3d 1008 (2017). In the present case, the time is of the essence provision in § 2.1.2 of article 2 of the contract specifically allows the plaintiff to institute default proceedings against the defendant to recover "damages and losses" if the defendant fails "to perform the work in a timely manner due to the [defendant's] poor planning, financial status, errors in construction or any other reason directly attributed to the [defendant's] circumstances . . . ." Notably, § 2.1.2 of article 2 does not reference "liquidated damages"; instead, it refers to "damages and losses." Because § 2.1.1 of article 2 of the contract specifically references "liquidated damages," the fact that § 2.1.2, instead, references "damages and losses" is evidence of a contractual intent to allow for the recovery of nondelay damages and losses, in addition to the liquidated damages due to delays allowed in § 2.1.1. To construe the contract otherwise would render that provision in § 2.1.2 superfluous. See *Assn. Resources, Inc.* v. *Wall*, supra, 298 Conn. 183 ("the law of contract interpretation . . . militates against interpreting a contract in a way that renders a provision superfluous" (internal quotation marks omitted)); see

also *Old Colony Construction, LLC* v. *Southington*, 316 Conn. 202, 214–15, 113 A.3d 406 (2015) ("[w]hen a contract expressly preserves remedies following termination, such a reservation must be given full effect absent evidence of a more limited intent").

We next must reconcile our conclusion with the general principle cited by the trial court that "a plaintiff may not recover both liquidated damages and actual damages."[24] *McClintock* v. *Rivard*, 219 Conn. 417, 430 n.13, 593 A.2d 1375 (1991). We hold that, under the specific language of the contractual provisions at issue here, our conclusion is not inconsistent with that principle. When, as here, a liquidated damages provision is limited in its application to damages resulting from delays and does not expressly provide that liquidated damages are the exclusive remedy, it does not prevent the recovery of actual damages for items to which the liquidated damages provision does not apply, i.e., nondelay damages. See 22 Am. Jur. 2d, Damages § 539 (2022) ("[a] provision for liquidated damages does not prevent the recovery of actual damages caused by events that are not covered by the liquidated damages clause unless the contract expressly precludes the recovery of damages other than those enumerated"). It stands to reason that, so long as the predicate for both awards is not the same, the recovery of both liquidated damages and actual or consequential damages will not result in an impermissible double award. Accordingly, although, because of the liquidated damages provision, the plaintiff cannot additionally recover actual or compensatory damages resulting from the delays caused by the defendant, the liquidated damages provision of the contract does not preclude the plaintiff from recovering from the defendant nondelay actual and consequential damages.

Although Connecticut courts have not yet squarely addressed this issue,[25] our conclusion is consistent with holdings of many state courts.[26] For example, in *Framan Mechanical, Inc.* v. *Dormitory Authority of the State of New York*, Docket No. A1114-14, 2019 WL 1747007, *10 (N.Y. Sup. March 7, 2019) (decision without published opinion, 114 N.Y.S.3d 814 (2019)), the Supreme Court of New York for Albany County stated: "Ordinarily, a party is awarded either actual damages or liquidated damages, but not both when the predicate for the awards is the same . . . . The rationale for this rule is that liquidated damages, by their nature, are in lieu of, not in addition to, other compensatory damages . . . . As a corollary, both actual and liquidated damages are recoverable damages when the predicate for the awards differ in kind . . . . As the United States Supreme Court has observed: There is no reason why parties competent to contract may not agree that certain elements of damage difficult to estimate shall be covered by a provision for liquidated damages and that other elements shall be ascertained in the usual manner.

Provisions of a contract clearly expressed do not cease to be binding upon the parties, because they relate to the measure of damages . . . *J.E. Hathaway & Co.* v. *United States*, 249 U.S. 460, 464 [39 S. Ct. 346, 63 L. Ed. 707 (1919)]." (Citations omitted; internal quotation marks omitted.)

Our conclusion also gives effect to the plain language of article 2, § 2.1.2 of the contract, providing that, if the defendant failed to complete its work in a timely manner due to the various reasons set forth, including poor planning or "any other reason directly attributed to the [defendant's] circumstances," the plaintiff could institute default proceedings to recover damages and losses, which necessarily must mean damages and losses other than those attributable to the delays. See *Old Colony Construction, LLC* v. *Southington*, supra, 316 Conn. 212 (determination of whether defendant was entitled to default based remedies was governed by express terms of parties' contract). It can be inferred from the court's many findings in its comprehensive decision that the defendant's failure to complete the work in a timely manner was due to poor planning or other reasons attributable to the work it agreed to perform, as the court found that the plaintiff had performed its obligations under the contract; that "the defendant may have used a mistaken basic assumption in making its bid and entering into the contract, which ultimately resulted in consequences adverse to it"; that the defendant's delay in doing the necessary testing and work was primarily the result of the defendant failing to "submit an acceptable CWP, [health and safety plan] and demolition work plan to TRC so that it could, in turn, submit any needed documents to the EPA for its approval, which was necessary for substantive work to begin"; that the defendant elected to demobilize from the site on or about November 20, 2015; that the defendant had refused to proceed with any further work until a CWP was done or if it was required to sample the steel; that, as of December, 2015, the defendant had finished less than 10 percent of the work required under the contract; and that the defendant had failed to account for the potential contamination or testing of some structural steel, which had been thought to have been recyclable and which, thereby, resulted in the need for additional work both in terms of time and labor.

We conclude, therefore, that the court erroneously failed to determine whether the plaintiff proved that it had suffered any compensable actual or consequential nondelay damages and, if so, the amount of such damages. Because the court did not make any factual findings about the existence and amount of the plaintiff's compensable nondelay related damages, we must remand this case to the trial court for a new hearing in damages.[27] At trial, the plaintiff sought three categories of alleged nondelay damages: (1) the difference in the contract price between what the plaintiff agreed to pay

the defendant and what it agreed to pay Costello allegedly for similar work; (2) additional costs associated with rebidding the job and the engineering support that went with it after the contract between the defendant and the plaintiff was terminated; and (3) additional costs to complete the job beyond Costello's accepted bid. On the basis of the issues raised on appeal, we provide the following guidance as to questions the court should consider with respect to each category of damages, given that these issues are certain to arise on remand.[28]

With respect to the first category of damages—the difference in contract price between the plaintiff's contract with the defendant and its contract with Costello—the plaintiff argues on appeal that "[t]he court erred in failing to account for [the $167,652 sum it had paid to the defendant] when it calculated the difference between [the defendant's] and Costello's contract price." On remand, not only will the court need to calculate the difference in price between the two contracts, but it also will need to consider any differences in the scope of the two contracts, as well as the fact that the defendant's contract with the plaintiff had been partially performed, which will factor into the court's calculation of the cost of the remaining work covered under the plaintiff's contract with Costello. Put another way, the plaintiff is entitled to damages for services that the defendant was supposed to complete but that Costello completed for a higher price.

As to the second category of damages—damages associated with rebidding the project—the court will need to determine whether the requested damages are either delay or nondelay damages. For example, a claim that the plaintiff incurred additional costs to oversee the project because it was delayed would be covered by the liquidated damages clause of the parties' contract and may not be additionally awarded as actual damages. On the other hand, the costs of drafting, printing, and distributing the new bid package and of reviewing bids submitted in response thereto would not be delay damages because they are damages caused by the defendant's failure to perform, rather than its delayed performance.

Finally, for the third category of damages—the plaintiff's claimed additional costs to complete the job over Costello's contract price—the court will need to determine whether such costs naturally flow from the defendant's default of its performance obligation under the parties' agreement and whether they were foreseeable to the defendant. On remand, therefore, the court must determine if the alleged damages flowing from the defendant's posttermination conduct have a sufficient nexus to its breaches of the contract, which the court found occurred in November and December, 2015, prior to when the plaintiff terminated its contract with the

defendant in January, 2016. See *Calig* v. *Schrank*, 179 Conn. 283, 286, 426 A.2d 276 (1979) ("[i]t is hornbook law that to be entitled to damages in contract a plaintiff must establish a causal relationship between the breach and the damages flowing from that breach"); *Meadowbrook Center, Inc.* v. *Buchman*, 149 Conn. App. 177, 186, 90 A.3d 219 (2014) ("proof of causation . . . properly is classified as part and parcel of a party's claim for breach of contract damages"); 3 Restatement (Second), Contracts § 346, p. 110 (1981) (in order to receive anything other than nominal damages, party must prove both that breach of contract "caused" loss and amount of loss). Additionally, "[a]s our Supreme Court has explained, [i]n an action founded . . . on breach of contract . . . the recovery of the plaintiffs [is] limited to those damages the defendant had reason to foresee as the probable result of the breach at the time when the contract was made. *Neiditz* v. *Morton S. Fine & Associates, Inc.*, 199 Conn. 683, 689 n.3, 508 A.2d 438 (1986); see also *Meadowbrook Center, Inc.* v. *Buchman*, [supra, 188–89] (under Connecticut law, the causation standard applicable to breach of contract actions asks . . . whether [the plaintiff's damages] were foreseeable to the defendant and naturally and directly resulted from the defendant's conduct)." (Internal quotation marks omitted.) *Bruno* v. *Whipple*, 186 Conn. App. 299, 311–12, 199 A.3d 604 (2018), cert. denied, 331 Conn. 911, 203 A.3d 1245 (2019). For example, if, because of the defendant's breach, the cost of completion became greater due to adverse weather conditions that would not have impacted the project had the defendant properly performed its obligations, the court would have to determine if such damages were foreseeable to the defendant and a natural consequence of the breach. On remand, the court will have to determine whether the plaintiff has made that necessary connection.

B

The last issue we must address is the plaintiff's claim that the court erred in limiting the award of liquidated damages to 254 days. We disagree.

In its memorandum of decision, the court specifically found that, "[a]lthough the job was never completed, *the plaintiff has not sought liquidated damages beyond 260 days* (adjusted to 254 days), which falls shortly after Costello received notice of the EPA's approval of the CWP. Thus, the total amount of liquidated damages due the plaintiff is found to be $508,000," which the court adjusted to $489,372 after it accounted for the retainage held by the plaintiff. (Emphasis added.) In its cross appeal, however, the plaintiff seeks additional liquidated damages for a time period that was not requested at trial. Specifically, in its appellate brief, the plaintiff explains that it had calculated liquidated damages "through the date on which Costello reached the same point in the project where [the defendant] left

off'' on the basis of its "understanding that [liquidated damages] were not the exclusive measure of its damages. The exhibit [submitted into evidence by the plaintiff detailing the damages it sought] was compiled based on the premise that it would be unfair to seek [liquidated damages] against [the defendant] during Costello's performance of project work." Given the court's determination that liquidated damages were the plaintiff's exclusive remedy under the contract, however, the plaintiff now claims on appeal that liquidated damages "should have been run through the date of the court's decision on December 20, 2019, a period of 1413 days."

This claim requires little discussion. It is well settled that "[a] party cannot present a case to the trial court on one theory and then seek appellate relief on a different one . . . . For this court to . . . consider [a] claim on the basis of a specific legal ground not raised during trial would . . . [be] unfair both to the [court] and to the opposing party." (Emphasis omitted; internal quotation marks omitted.) *Overley* v. *Overley*, 209 Conn. App. 504, 512, 268 A.3d 691 (2021). "[A]n appellate court is under no obligation to consider a claim that is not distinctly raised at the trial level. . . . The requirement that [a] claim be raised distinctly means that it must be so stated as to bring to the attention of the court the *precise* matter on which its decision is being asked. . . . The reason for the rule is obvious: to permit a party to raise a claim on appeal that has not been raised at trial—after it is too late for the trial court . . . to address the claim—would encourage trial by ambuscade . . . ." (Emphasis in original; internal quotation marks omitted.) Id., 511. In the present case, the plaintiff requested that the court award liquidated damages for a period of 260 days, which was adjusted by the court to account for a period of time in which the contract had been extended. The court awarded the plaintiff exactly what it had requested, with the exception of the adjustment, which the plaintiff has not challenged. We agree with the defendant that the plaintiff cannot on appeal now claim that the court should have based its award on a time period different from the one that the plaintiff relied on and requested at trial. See *White* v. *Mazda Motor of America, Inc.*, 313 Conn. 610, 619–20, 99 A.3d 1079 (2014). Furthermore, the plaintiff's claim is premised on the court's determination that liquidated damages were the plaintiff's exclusive remedy. Because we have concluded that the court erred in reaching that conclusion and that the plaintiff is entitled to actual or consequential nondelay damages to the extent they can be proved by a preponderance of the evidence, the premise of the plaintiff's claim on appeal no longer exists. Accordingly, this claim fails.

III

CONCLUSION

In summary, the court properly rendered judgment

in favor of the plaintiff on its breach of contract claim. Although the court's award of liquidated damages in the amount of $489,372 was proper, the court erred in concluding that liquidated damages were the plaintiff's exclusive remedy under the contract, which does not expressly preclude the recovery of damages other than the liquidated damages resulting from delays and, in fact, expressly allows the plaintiff to seek recovery for "damages and losses" in addition to the delay related liquidated damages. The court, thus, erroneously failed to determine whether the plaintiff proved that it had suffered any compensable actual or consequential non-delay damages and, if so, the amount of such damages. As a result, we must remand this case to the court for a new hearing in damages.

The judgment is reversed in part and the case is remanded for a new hearing in damages consistent with this opinion; the judgment is affirmed in all other respects.

In this opinion the other judges concurred.

[1] In its statement of issues, the defendant lists as its second issue "[w]hether the trial court erred as a matter of law by deciding that [the defendant] repudiated its obligations to perform under the contract . . . ." In its brief, however, the defendant characterizes the issue as whether "[t]he trial court erred in holding that the [plaintiff] lawfully terminated [the contract]." Because the defendant has not briefed the issue relating to its repudiation of the contract, we decline to address it. See *Regional School District 8* v. *M & S Paving & Sealing, Inc.*, 206 Conn. App. 523, 539 n.12, 261 A.3d 153 (2021) (declining to review claim not briefed, which was deemed abandoned).

[2] "EPA regulations define a 'non-porous' surface, in part, as follows: 'Non-porous surface means a smooth, unpainted solid surface that limits the penetration of liquid containing PCBs beyond the immediate surface. . . .' 40 C.F.R. § 761.3 [2015] . . . ." (Citation omitted.)

[3] "EPA regulations define a 'porous' surface as follows: 'Porous surface means any surface that allows PCBs to penetrate or pass into itself including, but not limited to, paint or coating on metal . . . .' 40 C.F.R. § 761.3 [2015] . . . . Some of the structural steel on the site, including overhead cranes, had painted surfaces." (Citation omitted.)

[4] "[Article 1 of the contract defined 'Contract Documents' as follows]: Whenever the term 'Contract Documents' is used [in the contract], it shall include the Agreement, Information to Bidders, General Specifications, Bid Documents, Technical Specifications, Special Notes, Addenda, and Project Plans, including all modifications thereof incorporated in the documents before their execution."

[5] On May 23, 2016, the defendant had filed a motion for an order preserving the site and for permission to inspect and test the site for possible PCBs and other environmental contaminants. In its motion, the defendant claimed that "[t]he tests [had to] be conducted to enable the defendant to determine if PCBs are present on structural steel to be demolished at, above or below acceptable levels and local, state and federal regulations," and that "[t]he testing [was] critical because an issue in this case will be whether the structural steel, which may be contaminated or coated by PCBs, can be recycled in an unregulated manner or must be handled as excluded PCB bulk product waste/state of Connecticut regulated waste, PCB bulk product waste, and/or PCB remediation waste." In response, the plaintiff filed a motion for a protective order barring the defendant from performing paint chip sampling for PCBs on the structural steel as proposed by the defendant in its motion for order. In an order dated August 19, 2016, which addressed the defendant's motion for order and the plaintiff's motion for a protective order, as well as the parties' objections thereto, the court ordered the defendant to identify, through counsel, fifteen areas from which it would like to receive pieces of the structural components of the building, which were to be cut in pieces three to five inches in length, and the defendant

was to have those pieces tested "in whatever way it want[ed]" at a laboratory agreed to by the parties.

⁶ Counts five and six of the defendant's counterclaim had been stricken by the court, which rendered judgment in favor of the plaintiff on those counts. They are not at issue in this appeal.

⁷ In response to the defendant's counterclaim, the plaintiff alleged ten special defenses. Specifically, the first, second, third, fourth and fifth special defenses cite to specific provisions of the contract as a bar to recovery by the defendant. The sixth special defense alleges that the plaintiff is protected by governmental immunity, the seventh, that the defendant did not mitigate its damages, the eighth, payment by the plaintiff, the ninth, that the defendant anticipatorily breached the contract, and the tenth, that the defendant contractually had assumed any risks relating to its performance under the contract. In its memorandum of decision, the court addressed the plaintiff's special defenses to the six remaining counts of the defendant's counterclaim and stated that "the court has elected to address the plaintiff's first, second, third, fourth and fifth special defenses, with respect to the fourth count of the defendant's counterclaim alleging negligent misrepresentation. The plaintiff has established those special defenses by a preponderance of the evidence. However, because the court has found [that] the defendant has failed to meet its burden of proof as to each [count] of its [counterclaim], [the court] need not further address any of the plaintiff's special defenses."

⁸ General Statutes § 42-158i (3) defines " 'retainage' " as "a sum withheld from progress payments to the contractor or subcontractor, otherwise payable to a contractor or subcontractor by an owner conditioned on substantial or final completion of all work in accordance with the terms of a written or verbal construction contract, but does not include any sum withheld due to the contractor's or subcontractor's failure to comply with construction plans and specifications."

⁹ In its brief, the defendant argues that this case involves a question of statutory interpretation and, thus, that the sole applicable standard of review is plenary review. We disagree. As the plaintiff aptly points out in its brief, the plaintiff and the defendant have not asserted causes of action grounded on the application of a statute, regulation, or ordinance, whether federal or state. Instead, the causes of action asserted by the parties stem from the contract, and the court's ruling was based on its interpretation of that contract.

¹⁰ "The trial court's findings are binding upon this court unless they are clearly erroneous in light of the evidence and the pleadings in the record as a whole. . . . In applying the clearly erroneous standard of review, [a]ppellate courts do not examine the record to determine whether the trier of fact could have reached a different conclusion. Instead, we examine the trial court's conclusion in order to determine whether it was legally correct and factually supported. . . . This distinction accords with our duty as an appellate tribunal to review, and not to retry, the proceedings of the trial court. . . . [I]n a case tried before a court, the trial judge is the sole arbiter of the credibility of the witnesses and the weight to be given specific testimony. . . . The credibility and the weight of expert testimony is judged by the same standard, and the trial court is privileged to adopt whatever testimony [it] reasonably believes to be credible. . . . On appeal, we do not retry the facts or pass on the credibility of witnesses." (Internal quotation marks omitted.) *DeMattio* v. *Plunkett*, 199 Conn. App. 693, 711–12, 238 A.3d 24 (2020).

¹¹ The defendant's reliance on 40 C.F.R. § 761.61 (a) (2) is unavailing. Any obligation of the plaintiff to characterize the site adequately pursuant to that regulation relates to the plaintiff's representations in its notification to the EPA, not to the defendant. The plaintiff's obligations to the defendant arise under the contract, not the federal regulation.

¹² "[T]o the extent that the court's decision is founded on its credibility determinations, we cannot second-guess those determinations on appeal." *Alpha Beta Capital Partners, L.P.* v. *Pursuit Investment Management, LLC*, 193 Conn. App. 381, 441, 219 A.3d 801 (2019), cert. denied, 334 Conn. 911, 221 A.3d 446 (2020), and cert. denied, 334 Conn. 911, 221 A.3d 446 (2020).

¹³ The court found: "The defendant's expert, Insall, testified that it was his opinion that paint chip testing was required. On cross-examination, however, Insall first acknowledged that he could not say whether the painted steel was to be treated as bulk product waste or remediation waste. This of course would affect what test might be appropriate, or, if any test would be required at all. Secondly, Insall acknowledged that the EPA had information available to it from phase II of the project that referenced painted building

columns, that the EPA had approved surficial (wipe) samples for painted surfaces including columns, that the EPA had the discretion to allow this, and that it never revoked its September 1, 2015 approval letter.

"Insall also testified that paragraph 13 of the approval letter dealt with site characterization. Yet, a reading of that paragraph says nothing about characterization of the site or any action necessary to make a characterization. Insall even conceded that if material referenced was considered as bulk waste product, there is no characterization requirement under 40 C.F.R. § 761. A site characterization is done in the process of obtaining an approval letter, not as a condition of the approval.

"With respect to the disposal standards relative to contamination and recyclability, Insall opined that the standards referenced were for the overhead steel cranes and not the steel beams. However, this makes little sense as the wording of the letter places the cranes and beams together in the same sentence in the description of cleanup standards for nonporous surfaces. Insall further opined that there was a distinction between 'columns' and 'beams' in that columns were vertical and beams were horizontal. The importance of the distinction to Insall was that dust accumulates on horizontal beams and that paragraph 13 only covers horizontal beams. On its face, Insall's testimony clearly implies that dust did not accumulate on the vertical beams, which borders on being a ludicrous statement. See *State* v. *Zayas*, 195 Conn. 611, 620, 490 A.2d 68 (1985) ('[i]t is an abiding principle of jurisprudence that common sense does not take flight when one enters a courtroom').

"While the report Insall submitted to the EPA (which was put into evidence) was highly detailed, his credibility was put into issue by his testimony. To the extent there was credible evidence put forth, it does not outweigh the collective testimony of the plaintiff's experts on the subjects addressed."

[14] The basis for the defendant's claim of negligent misrepresentation by the plaintiff at trial was its assertion that the plaintiff had misrepresented the condition of the steel beams. The court, however, found that the defendant had failed to prove its claim of negligent misrepresentation by a preponderance of the evidence and, in addition, had waived any such claim of misrepresentations by the plaintiff as to the condition of the steel beams under various provisions of the contract. Specifically, the court found that, "[t]he plaintiff had disclosed in advance to all prospective bidders, including the defendant, up to the date of the signing of the contract, all project documents and historical data that had been acquired through phases I and II, as well as a copy of the proposed contract and supporting documents, and eventually, the EPA approval letter." The court examined the bidding documents and contractual provisions, which make clear that the bidder was responsible for investigating the physical condition of the site and could not rely on information provided by the plaintiff. For example, § 3.7.1 of article 3 of the contract provides that "[the defendant] agrees that [it] shall not use or be entitled to use any such information made available to [it] through the contract documents or otherwise or obtained by [it] in [its] own examination of the site, as a basis of or ground for any claim against the [plaintiff] . . . ." The court found that the § 3.7.1 disclaimer provision, along with others in the contract, were sufficient to defeat the defendant's claim of negligent misrepresentation. The court further noted that Kurt, who had prepared the CWP for the defendant, acknowledged in his testimony that he was aware of the provision in the phase III remediation plan that "referenced that the overhead steel cranes reportedly contained [a certain level of] surface contamination" and that, "[w]hen asked why the defendant had not done greater testing in light of the information and his having physically seen the cranes and other painted steel at the walk-through on the site, Kurt simply stated that it was 'my error.' " The court, thus, concluded that the defendant had failed to establish that the plaintiff misled either the EPA or the defendant as to the condition of the site.

With respect to the issue of waiver, the court found that, "[t]hroughout the process, the plaintiff advised the defendant and all other potential bidders they were not to rely on any representations made by the plaintiff, that it offered no warranties and that they should satisfy themselves through their own investigation as to the character and condition of the site." As the court stated, "[w]hile claiming [that] the plaintiff had misrepresented the condition of the steel and thereby affected the ability of the defendant to properly bid and do the job, the defendant's own affirmative statements, which are contractually binding, run counter to that position. The terms make clear that the defendant had carefully reviewed the documents made available to it, had physically viewed the site and was aware of conditions that might affect the cost and work to be done." The defendant has not challenged the court's findings regarding waiver on appeal.

[15] See footnote 1 of this opinion.

[16] To the extent that the defendant's claim can be construed as a challenge to the court's finding that it breached the contract, that claim fails as well, as the court's finding that the defendant breached the contract was not clearly erroneous.

[17] See footnote 5 of this opinion.

[18] With respect to the change orders, the court found that "there was credible documentary and testimonial evidence from Doubleday, Zarba and Mike Costello to establish the validity of those expenses. . . . These expenses were a direct consequence of the defendant's failure to complete the contract and its unilateral correspondence with the EPA subsequent to its dismissal from the job. That contact resulted in not only expanded PCB testing, it raised disposal costs and required both Costello and TRC to remain on the job much longer and to perform more work than originally anticipated." (Citations omitted.)

[19] In light of our conclusion that the issue of damages must be remanded to the court for a new hearing, we do not address the plaintiff's third claim.

[20] See footnote 8 of this opinion.

[21] General Statutes 49-41b provides in relevant part: "When any public work is awarded by a contract for which a payment bond is required by section 49-41 and such contract contains a provision requiring the general or prime contractor under such contract to furnish a performance bond in the full amount of the contract price, the following shall apply . . . (3) If the awarding authority is a municipality, (A) the municipality shall not withhold more than five per cent from any periodic or final payment which is otherwise properly due to the general or prime contractor under the terms of such contract . . . ."

We note that, although § 49-41b has been amended by the legislature since the events underlying the present appeal; see, e.g., Public Acts 2016, No. 16-104, § 1; those amendments have no bearing on the merits of this appeal. In the interest of simplicity, we refer to the current revision of the statute.

[22] In the present case, the court found that the liquidated damages provision was enforceable because all three criteria had been met to establish the validity of the liquidated damages provision: damages resulting from a breach of contract were uncertain at the time the parties entered into the contract; the parties clearly expressed their intent to liquidate damages in advance as expressed in article 2, § 2.1.1; and the amount stipulated was reasonable. The defendant did not challenge the enforceability of the liquidated damages provision at trial, nor has it challenged on appeal the court's finding concerning its validity and enforceability. The court's finding that the provision was valid and enforceable, thus, is not at issue in this appeal.

[23] "When it is said that time is of the essence, the proper meaning of the phrase is that the performance by one party at the time specified in the contract or within the period specified in the contract is essential in order to enable him to require performance from the other party. . . . Its commonly understood meaning is that insofar as a time for performance is specified in the contract, failure to comply with the time requirement will be considered to be a material breach of the agreement." (Internal quotation marks omitted.) *Blackwell* v. *Mahmood*, 120 Conn. App. 690, 699 n.4, 992 A.2d 1219 (2010).

[24] "Actual or compensatory damages, the terms being synonymous, are damages in satisfaction of, or in recompense for, loss or injury sustained." (Internal quotation marks omitted.) *Manning* v. *Pounds*, 2 Conn. Cir. 344, 346, 199 A.2d 188 (1963).

[25] In its brief, the plaintiff argues that *Dean* v. *Connecticut Tobacco Corp.*, 88 Conn. 619, 625, 92 A. 408 (1914), and *Banta* v. *Stamford Motor Co.*, supra, 89 Conn. 51, both support the principle that a liquidated damages provision in a contract does not preclude the nonbreaching party from seeking and being awarded damages for defective or unfinished construction, or for nondelay damages not covered by the liquidated damages provision. We disagree. One of the issues before our Supreme Court in *Dean* was whether the defendant was harmed by a jury instruction relating to the third count of its counterclaim, which alleged a claim for special damages through injury to harvested tobacco resulting from delay in the completion of a warehouse beyond the stipulated date. *Dean* v. *Connecticut Tobacco Corp.*, supra, 624. The court concluded that, because the evidence in support of the claim for special damages was speculative, the jury instruction that there could be no recovery of those damages was amply justified. Id., 624–25. Furthermore, the court noted that the parties had a provision in their contract for liquidated damages to be recoverable for any delay in the completion of the work and

stated that "[t]he parties having stipulated in advance as to the amount of damages recoverable, further recovery, or recovery upon some other basis, could not, of course, be had." Id., 625–26. In *Banta*, the issue before our Supreme Court was whether the liquidated damages provision in the parties' contract providing for the recovery of liquidated damages in the event of delay in the completion of the construction of a pleasure boat was a penalty, which the law would not enforce. *Banta* v. *Stamford Motor Co.*, supra, 54. The court determined that the provision was enforceable, as the amount of liquidated damages provided for in the contract was not unreasonable; id., 57; and stated that, because "[t]he defendant, by its contract with the plaintiff, agreed to pay these sums in the event named . . . [i]t must abide by its bargain . . . ." Id., 54. In neither case did our Supreme Court address the issue or conclude that a party may recover both liquidated damages and completion or other nondelay damages.

[26] See *Delaware Limousine Service, Inc.* v. *Royal Limousine Service, Inc.*, Docket No. C.A. 87C-FE-104, 1991 WL 89787, *1 (Del. Super. May 2, 1991) (following general rule that liquidated damages provision does not prevent recovery of actual damages caused by events that are not covered by liquidated damages clause unless contract expressly provides that damages other than those enumerated shall not be recovered); *Lawson* v. *Durant*, 213 Kan. 772, 775, 518 P.2d 549 (1974) (same); *Meyer* v. *Hansen*, 373 N.W.2d 392, 395 (N.D. 1985) (same); *Visa, Inc.* v. *Sally Beauty Holdings, Inc.*, Docket No. 02-20-00339-CV, 2021 WL 5848758, *12 (Tex. App. December 9, 2021) (same), petition for review filed (Tex. February 23, 2022) (No. 22-0024); *VanKirk* v. *Green Construction Co.*, 195 W. Va. 714, 719, 466 S.E.2d 782 (1995) (same), cert. denied, 518 U.S. 1028, 116 S. Ct. 2571, 135 L. Ed. 2d 1087 (1996); see also *A. Miner Contracting, Inc.* v. *Toho-Tolani County Improvement District*, 233 Ariz. 249, 258, 311 P.3d 1062 (Ariz. App. 2013) ("a party may not receive actual and liquidated damages for the same injury; however, actual damages related to the cost of completion are separate and distinct from liquidated damages intended to compensate for injury resulting from delay"), review denied, Arizona Supreme Court (March 21, 2014); *Draper* v. *Westwood Development Partners, LLC*, Docket No. CIV.A. 4428-MG, 2010 WL 2432896, *3 (Del. Ch. June 3, 2010) ("[u]nless a contract provides that liquidated damages are to be the exclusive remedy for a breach, a liquidated damages provision does not preclude other relief to the nonbreaching party, if the actual damages are caused by an event not contemplated by the parties in the liquidated damages clause"); *Phillips* v. *Gomez*, 162 Idaho 803, 810, 405 P.3d 588 (2017) ("a liquidated damages clause does not preclude a party from suing for actual damages if that right is preserved in the contract between the parties" (internal quotation marks omitted)); *Spinella* v. *B-Neva, Inc.*, 94 Nev. 373, 376, 580 P.2d 945 (1978) (claim that liquidated damages clause was sole measure of damages available was refuted by plain and unambiguous language of provision, which manifested intent that liquidated damages compensated only for delay in performance, and, thus, award of actual damages resulting from contractor's defective workmanship was proper); *Construction Contracting & Management, Inc.* v. *McConnell*, 112 N.M. 371, 377, 815 P.2d 1161 (1991) ("an award of actual damages unrelated to delay does not preclude an award of liquidated damages for delay-related damages" as "[t]he vice to be guarded against is a duplication of damages" (internal quotation marks omitted)); *Noble* v. *Ogborn*, 43 Wn. App. 387, 390, 717 P.2d 285 (liquidated damages clause does not preclude party from seeking actual damages when that right is preserved in contract), review denied, 106 Wn. 2d 1004 (1986).

[27] In determining whether the liquidated damages clause was a reasonable estimate of damages and not a penalty, the court noted that the plaintiff presented credible evidence supporting specific items of damage and the amounts thereof. The context in which the court's determinations were made, in its analysis of the reasonableness of liquidated damages, however, is different from that where the court actually would be making the required finding that the plaintiff proved its damages by a preponderance of the evidence. Thus, we cannot rely on the court's findings regarding this evidence to direct that judgment be rendered for the plaintiff on the items and amounts identified by the court as supported by the evidence with respect to the reasonableness of liquidated damages. Furthermore, the plaintiff argues on appeal that the court miscalculated the amount of its actual damages with respect to at least one category of actual damages. For these reasons, we believe that a remand for a new damages hearing is required.

[28] We do not intend this to be an exhaustive list of relevant issues for the court to consider at the damages hearing. We merely identify and address

specific issues raised by the parties in this appeal.

_____